783 F.2d 1306
 40 Fair Empl.Prac.Cas. 453,
40 Empl. Prac. Dec. P 36,115, 54 USLW 2487
 Carrie M. HAMILTON, as Administratrix of the Estate of James
W. Hamilton, Deceased, Plaintiff-Appellee,
v.
V.E. RODGERS, etc., et al., Defendants,
Fire Department of the City of Houston, C.L. Wilford, etc.,
and C.P. Nelson, Defendants-Appellants.
 No. 84-2720.
 United States Court of Appeals,
 Fifth Circuit.
March 7, 1986.
 
 John E. Fisher, Houston, Tex., James C. Faulkner, Houston, Tex., for defendants-appellants.
 Patrick J. Gilpin, Houston, Tex., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of Texas.
 Before GEE and JOHNSON, Circuit Judges, and PARKER,* District Judge.
 GEE, Circuit Judge:
 
 
 1
 This appeal comprises claims under 42 U.S.C. Secs. 1981, 1983, and 2000e et seq. (Title VII) against the Houston Fire Department and various individual defendants for the alleged racial harassment of, and retaliation against, an employee now deceased. The district court found the existence of such racially motivated behavior and therefore assessed backpay and compensatory damages against the Fire Department and the employee's immediate supervisors. Because we conclude that the Fire Department was improperly held liable and that the evidence of the discrimination's detrimental effects on the employee's physical health was insufficient to warrant compensatory damages, we affirm in part, reverse in part and remand for further proceedings consistent with our rulings.
 
 
 2
 The Houston Fire Department hired James Hamilton as a radio technician in January 1979. Being black, Hamilton soon became an object of his co-workers' bigotry; on several occasions he was subjected to ugly racial slurs and nasty pranks. His fellow employees apparently harbored little actual ill-will toward Mr. Hamilton, but their "humor" was offensive and painful to him. Relations between Hamilton and his supervisors also soured. Although he initially received favorable evaluations, critical ones began to accrue in the fall of 1980. In November of that year, Hamilton filed an EEOC charge, claiming discrimination by both his superiors and his co-workers. Things apparently got no better because, in January 1982, Hamilton filed this action. In the summer of 1982, he was first suspended and then reinstated at a lower rank and with less pay.
 
 
 3
 During this time, Hamilton's health was deteriorating. In October 1979, he discovered that he had extremely high blood pressure. Hospitalization was required in early 1980, and his health failed thereafter. Hamilton suffered a stroke in November 1982 and, never recovering fully, died in February 1983. His widow, as administratrix of his estate, was substituted as the plaintiff in this action.
 
 
 4
 After a bench trial on Hamilton's claims, the district court held that there existed both a racist work environment and a deliberate effort to punish Hamilton for aggressively seeking equal treatment. Defendants Houston Fire Department, C.L. Wilford, and C.P. Nelson were held jointly and severally liable and ordered to pay to Hamilton's estate $3,129 in backpay and $50,000 compensatory damages for the mental anguish and the physical problems caused by work-related stress. They appeal these rulings.
 
 
 5
 We begin our review of the district court's judgment by noting the nature of Hamilton's claims. To establish a prima facie case of unlawful retaliation against one seeking equal treatment, a preponderance of the evidence must establish the following facts:
 
 
 6
 1. the plaintiff was engaged in an activity protected by Title VII;
 
 
 7
 2. an adverse employment action occurred; and
 
 
 8
 3. the plaintiff's participation in the protected activity caused the adverse employment action.
 
 
 9
 Dickerson v. Dade County, 659 F.2d 574, 580 (5th Cir.1981). If no legitimate, non-discriminatory reason for the defendant's actions exists, or if the plaintiff can show any excuse offered to be merely a pretext for discrimination, then Title VII liability results. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973). One may also establish a Title VII violation by showing "a discriminatory and offensive work environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers...." Vaughn v. Pool Offshore Co., 683 F.2d 922, 924 (5th Cir.1982),quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir.1971), cert. denied 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). Successfully meeting these requirements would also establish a successful case under 42 U.S.C. Secs. 1981 and 1983; when these statutes are used as parallel causes of action with Title VII, they require the same proof to show liability. See Whiting v. Jackson State University, 616 F.2d 116, 121 (5th Cir.1980). Hamilton was found to have successfully carried his burden; we review this determination by first distinguishing consideration of the Fire Department's liability from that of the supervisors.
 
 LIABILITY OF HAMILTON'S SUPERVISORS
 
 10
 The only individuals found liable were C.L. Wilford and C.P. Nelson, Hamilton's immediate superiors. Their liability resulted from the district court's determination that they not only ignored the racist antics of Hamilton's co-workers but themselves intentionally discriminated against him. This determination is considered a finding of fact, reversible only if it is clearly erroneous. Anderson v. Bessemer City, 470 U.S. ----, ----, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528, (1985). The "clearly erroneous" standard, moreover, forbids us to second-guess the district court:
 
 
 11
 If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as a trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.
 
 
 12
 Id. We must therefore extend great deference to the district court's findings, especially since they stem from assessments of the witnesses' credibility. Id. 470 U.S. at ----, 105 S.Ct. at 1512, 84 L.Ed.2d at 529.
 
 
 13
 Review of the entire record convinces us that the district court enounced a plausible explanation for the supervisors' actions. Testimony indicates that the two tried to "freeze out" Hamilton by refusing to provide him the assistance that he needed to become proficient at radio maintenance. Hamilton's occupational skills naturally languished, providing an excuse for his suspension. One may plausibly conclude, moreover, that discriminatory intent motivated decisions such as those denying Hamilton a car assignment and scheduling him for the night shift. The record provides support for the district court's conclusions.
 
 
 14
 Liability under Title VII does not automatically follow, however, we must instead proceed cautiously, recognizing that it is only employers who are subject to statutory liability. The definition of "employer" is, however, broad, including agents of the actual employer. 42 U.S.C. Sec. 2000e(b). In ascertaining the scope of agency, we have recognized that Title VII "should be accorded a liberal interpretation in order to effectuate the purpose of Congress to eliminate the inconvenience, unfairness, and humiliation of ethnic discrimination." Rogers, 454 F.2d at 238. So viewed, Wilford and Nelson were agents of the Fire Department, despite their intermediate standing within the Department's hierarchy. They had authority over matters such as car assignments and the staffing of shifts, and they wielded this authority to Hamilton's detriment. Even more important, they filed the critical reports that lead to Hamilton's 1982 suspension. We agree with the view that "[a] person is an agent under Sec. 2000e(b) if he participated in the decision-making process that forms the basis of the discrimination." Jones v. Metropolitan Denver Sewage Disposal District, 537 F.Supp. 966, 970 (D.Col.1982). To hold otherwise would encourage supervisory personnel to believe that they may violate Title VII with impunity. Defendants Wilford and Nelson were correctly held liable.
 
 LIABILITY OF THE HOUSTON FIRE DEPARTMENT
 
 15
 Under Sec. 1983, the Fire Department cannot be held vicariously liable for the actions of its employees; "... the doctrine [of respondeat superior] has no application in an action under 42 U.S.C. Sec. 1983." Dean v. Gladney, 621 F.2d 1331, 1336 (5th Cir.1980), cert. denied sub nom. Dean v. County of Brazoria, 450 U.S. 983, 101 S.Ct. 1521, 67 L.Ed.2d 819 (1981), quoting Jones v. City of Memphis, 586 F.2d 622, 625 (6th Cir.1978). Instead, liability under Sec. 1983 can arise only "for a deprivation of rights protected by the Constitution or federal laws that is inflicted pursuant to official policy." Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir.1984) (en banc). No officially promulgated policy encouraged racial discrimination; to the contrary, a Fire Department rule explicitly prohibits racial slurs or jokes. We have recognized, however, that official policy need not be formally announced in a statement or regulation. Webster provided a second definition:
 
 
 16
 A persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom the body had delegated policymaking authority. Actions of officers or employees of a municipality do not render the municipality liable under Sec. 1983 unless they execute official policy as above described.
 
 
 17
 Id.
 
 
 18
 The district court concluded, as a matter of law, that the offensive conditions existed to such a persistent, widespread degree that they could properly be deemed to represent official policy of the Fire Department. We disagree with this conclusion. Hamilton's co-workers unquestionably tainted the work atmosphere with their racist bigotry, and the supervisors contributed to the harassment. The number of racial incidents recounted, however, were too few to constitute "a persistent, widespread practice ... so common and well-settled as to constitute a custom...." Perhaps a dozen incidents arose within the two and a half years preceding Hamilton's suspension; no continual pattern therefore arose that would warrant the imputation of constructive knowledge to high ranking officers of the Fire Department. While evidence suggests that these officers heard of occasional incidents, there was no showing that they knew, or had reason to know, of a persistent, nagging problem of racism.
 
 
 19
 The district court declared that "[t]he inability of these senior policy-making officials to take affirmative corrective or other supervisory actions leads to the inference of an implicit official policy on the part of the local government." Yet the evidence showed that when officers such as Assistant Chief Dennis Holder learned of racial incidents, they promptly acted to discourage them, reprimanding those responsible and noting the incidents in the offenders' files. To hold that this was an insufficient response, that something more should have been done, would require us to meddle in the Department's policy making to an intolerable degree. While a municipal department should strive to end racial discrimination within its ranks, it cannot be held accountable for every bigoted act of its employees. As an employer, it simply lacks the power to guarantee an environment free from all bigotry. Nor can judicially-imposed rules and enforcement mechanisms change the beliefs of the employees. Beyond the imposition of some minimal standard of responsibility upon the Fire Department and its senior officers, dictating prolix regulatory schemes to combat the narrow-minded intolerance of municipal employees falls beyond the province of the federal judiciary. For this reason, we hold that the Fire Department may not be held liable under Sec. 1983 or Title VII.
 
 COMPENSATORY DAMAGES
 
 20
 Hamilton's estate may recover compensatory damages under the Sec. 1983 claim. See Carey v. Piphus, 435 U.S. 247, 253-57, 98 S.Ct. 1042, 1046-49, 55 L.Ed.2d 252 (1978). The district court held the estate entitled to $50,000 compensatory damages for injuries to Hamilton's emotional and physical health, concluding that "Hamilton suffered from October 1979 until his death from humiliation, mental anguish, and a decline in his physical and mental health." The record clearly shows Hamilton's physical health failing in the two years preceding his death. We are unsatisfied, however, that the work-related stress caused his long physical decline and eventual death. Because insufficient certainty as to causation exists, we must regard the award of compensatory damages as clearly erroneous.
 
 
 21
 The medical records from late 1979 to 1982 reveal that Hamilton suffered from extremely high blood pressure. This condition could well have caused his November 1982 stroke and his death three months later. The evidence also indicates that Hamilton encountered great stress from the racial jokes, the harassment, and the retaliation of his supervisors. Stress can undoubtedly be a cause of high blood pressure, yet the record suggests that Hamilton contributed to his own physical decline. In the twenty years before 1981, he smoked between one and a half to two packs of cigarettes daily. A November 1982 medical report stated that he also drank six to twelve cups of coffee daily. Salt was liberally used in his diet. Finally, hypertension may have run in his family, as one uncle also suffered from high blood pressure. These factors considered, the most any witness, expert or lay, could properly say is that the racial incidents could have been a factor in the development of Hamilton's physical problems.[1] Our law recognizes no "could have been a factor" standard of causation, however, and such speculation is an insufficient basis for an award of compensatory damages.[2]
 
 
 22
 On the other hand, the evidence shows that Hamilton endured embarrassment, humiliation, and mental distress from his work environment. His suffering is not without redress, as Sec. 1983 allows for the recovery of compensatory damages for such injury:
 
 
 23
 Emotions are intangible but they are none the less perceptible. The hurt done to feelings and to reputation by an invasion of constitutional rights is no less real and no less compensable than the cost of repairing a broken window pane or a damaged lock. Wounded psyche and soul are to be salved by damages as much as the property that can be replaced at the local hardware store.
 
 
 24
 Baskin v. Parker, 602 F.2d 1205, 1209 (5th Cir.1979). On remand, therefore, compensatory damages are to be computed with only the emotional injury taken into consideration.
 
 CONCLUSION
 
 25
 We agree with the assessment of liability against Hamilton's supervisors, Wilford and Nelson. Relief against them may be in the form of lost backpay and compensatory damages for Hamilton's mental anguish. The Fire Department is absolved from liability, however, and no compensatory damages may be recovered for merely possible physical harm done. The district court's judgment is therefore AFFIRMED in part, REVERSED in part and REMANDED.
 
 
 
 *
 District Judge of the Eastern District of Texas, sitting by designation
 
 
 [1]
 A psychologist, for example, testified to his view that there was "a strong correlation between the incidents and the hypertension which eventually created heart problems...." Whatever this may mean, it falls far short of expert medical testimony that the incidents were a probable cause of Mr. Hamilton's death
 
 
 [2]
 It was plaintiff's burden to prove that harassment proximately caused the ultimate condition leading to Mr. Hamilton's death. Theriot v. Bay Drilling Corp., 783 F.2d 527 (5th Cir.1986)