767 P.2d 697

Virginia **BROOMFIELD,**
**Plaintiff–Appellant,**

v.

**Dwight C. LUNDELL and Dinah Lundell,**
**husband and wife, and Desert Thoracic**
**& Cardiovascular Surgeons, Ltd., De-**
**fendants–Appellees.**

**No. 1 CA–CIV 9470.**

Court of Appeals of Arizona,
Division 1, Department D.

Aug. 9, 1988.
Review Denied Feb. 7, 1989.

Hocker & Axford, P.C. by R. Kelly Hocker and Naida Axford, Tempe, for plaintiff-appellant.

Bentley, Brandes & Brandes, P.C. by Katherine E. Swank, Richard N. Brandes, Phoenix, for defendants-appellees.

## OPINION

CONTRERAS, Judge.

Appellant Virginia Broomfield (Broomfield) brings this appeal from summary judgment entered in favor of appellees Desert Thoracic & Cardiovascular Surgeons, Ltd. (Desert) and Dwight and Dinah Lundell (Dr. Lundell) on Broomfield's claims for relief under the Arizona Civil Rights Act, A.R.S. § 41–1401 *et seq.*, and for damages for wrongful discharge. Contract Staffing of America, Inc. (CSA) was also a defendant in the trial court, but is not a party to this appeal. The following issues are presented for our consideration: (1) whether Dr. Lundell was an "employer" subject to the Arizona Civil Rights Act by virtue of his relationship with CSA; (2) whether an implied contract existed between Dr. Lundell and Broomfield that imposed on Dr. Lundell a duty of good faith and fair dealing; and (3) whether a tort claim for damages for wrongful discharge may be predicated on a discharge that allegedly violated the public policy behind the antidiscrimination provisions of A.R.S. § 41–1463(B). We have jurisdiction pursuant to A.R.S. § 12–2101(B) and Rule 54(b), Arizona Rules of Civil Procedure.

## FACTS AND PROCEDURAL HISTORY

Broomfield is a registered nurse and at all times relevant was not married. On August 5, 1980 Dr. Lundell, who was practicing at that time with Phoenix Heart and Lung Surgeons, hired her to be his private scrub nurse.

Dr. Lundell incorporated Dwight C. Lundell, M.D., P.C. on June 5, 1980, and has at all times owned all the issued and outstanding shares in that corporation. On February 8, 1983, Dwight C. Lundell, M.D., P.C., entered into an agreement with CSA under which Dr. Lundell agreed to lease his staff from CSA.[1] When the lease was executed, Dr. Lundell leased two employees, Broomfield and Jamar Gill, from CSA. Dr. Lundell owned no stock or any other interest in CSA, and had never been an officer, director or employee of that corporation. No one with an ownership interest in or any relationship to CSA owned any interest in or ever acted as an officer, director or employee of any business in which Dr. Lundell had an interest. From Dr. Lundell's perspective, the advantages of the employee leasing agreement between CSA and Dr. Lundell were: (1) CSA would perform the payroll deductions and other bookkeeping work involved with employees; (2) the leasing arrangement would permit Dr. Lundell, consistent with federal law, to exclude his workers from participation in his personal pension plan; and (3) the leasing arrangement resulted in providing better insurance and other employee benefits to Dr. Lundell's workers as part of a larger group.

When Broomfield became "employed" with CSA, Dr. Lundell told her nothing would change with respect to her work. Broomfield thereafter received her time cards from CSA and when she had completed them, she mailed them directly to CSA. CSA paid her her salary less taxes. CSA

---

1. Dwight C. Lundell, M.D., P.C. is not a party to this litigation. Appellee Desert Thoracic & Cardiovascular Surgeons, Ltd. was incorporated on March 23, 1983. Dr. Lundell owns 50% of Desert's shares, and is its sole employee. In footnote 2 of their motion for summary judgment, Desert Thoracic and Dr. Lundell stated in part:

   It is clear that CSA contracted with Dwight C. Lundell, M.D., P.C. ("P.C."), an Arizona professional corporation, and not with Desert, nor with Dr. Lundell. In addition, it is clear that no evidence exists which would lead any reasonable person to conclude that either P.C. or Desert is the alter ego of Dr. Lundell.... For purposes of this Motion, however, it is of no importance which entity is deemed to have been the contracting party with CSA since such a finding is not relevant to a determination of the issues raised by the instant motion....

   Both Broomfield and the trial court followed this approach in resolving the issues. We continue this approach on appeal, and accordingly refer hereafter to the party contracting with CSA as "Dr. Lundell."

also provided all her employment-related benefits, including unemployment insurance, worker's compensation, medical and dental insurance, vacation, sick leave and pension benefits. CSA also established grievance procedures, transfer procedures, holidays, a sick leave policy, a maternity leave policy and company rules.

No CSA employee performed any administrative personnel functions in Dr. Lundell's office. No one with CSA supervised Broomfield's daily activities in any respect, and CSA considered Dr. Lundell as the "supervisor" of his office. Dr. Lundell shared the decisions concerning who would serve as scrub nurse in Dr. Lundell's office with Judy Vail of CSA. According to Vail, the determination of employee quality and duty assignments was a joint function of Dr. Lundell and CSA. Dr. Lundell participated in employee performance rating, but had no recollection of having conferred with anyone from CSA on that topic. Dr. Lundell understood that as long as an employee remained acceptable to him, she would remain an employee of CSA.

As Dr. Lundell had told Broomfield, her working relationship with him did not change with the inception of the CSA employee leasing arrangement. Dr. Lundell continued to set her hours of employment, and made no changes in those hours. There was also no change in the nature of her work or in the manner in which it was to be done. Dr. Lundell had day-to-day control and Broomfield considered him as her employer "from the point of view of job responsibility."

In November of 1983, Broomfield told Dr. Lundell she was pregnant. In March of 1984, as the result of an increased surgery case load and Broomfield's approaching maternity leave, Dr. Lundell leased Lynn Mach, a registered nurse, from CSA. From March to May of 1984, Dr. Lundell's surgery schedule diminished from approximately 47 to approximately 23 cases per month.

Broomfield took her maternity leave on or about May 18, 1984. Four days later she gave birth. On or about May 22, 1984, Dr. Lundell telephoned Judy Vail of CSA and told her that because of the reduction in his surgeries he would only be needing one registered nurse to assist him, and preferred that Lynn Mach be retained. He told Vail that Broomfield was abrasive, abusive and extremely difficult to work with both in the office and in the operating room, and that because Mach was much easier to work with, there was less tension in the operating room and therefore less chance for error.

Broomfield's assignment as Dr. Lundell's scrub nurse was terminated effective May 21, 1984. On or about May 29, 1984, CSA informed Broomfield that Dr. Lundell could not afford to lease two registered nurses and that she would no longer be needed in his office. Thereafter, CSA attempted to place Broomfield in one of its other subscribers' offices. Broomfield eventually accepted employment outside CSA.

Broomfield later filed a charge of employment discrimination against CSA with the Civil Rights Division of the Arizona Department of Law pursuant to A.R.S. § 41–1461 *et seq.* On April 10, 1985 the division issued to Broomfield a "right-to-sue" letter pursuant to A.R.S. § 41–1481(D).[2] Broomfield filed her complaint in this action on July 9, 1985. CSA commenced bankruptcy proceedings in California on September 9, 1986, and the action was automatically stayed as to it. Dr. Lundell subsequently moved for summary judgment. Broomfield responded and countered with a motion for partial summary judgment. On September 29, 1986, the trial court issued a minute entry which stated in part:

> Even if Lundell is the employer or joint employer of Broomfield, he is not subject to the Arizona Discrimination in Employment Act in that capacity because he has less than 15 employees.

**2.** The parties have not litigated the question of whether Broomfield's failure to name Desert Thoracic or Dr. Lundell as respondents in her charge before the Civil Rights division had any effect on her right to seek judicial relief against them under the Arizona Civil Rights Act, and we therefore do not consider that question. *See generally* A.R.S. § 41–1481(D). See also *Bernstein v. Aetna Life and Casualty,* 843 F.2d 359 (9th Cir.1988).

The Court therefore considers the question of whether Lundell is the agent of the employer CSA.

Although Lundell exercised control over Broomfield, he did so because of leasing her from CSA, not as an agent of CSA. CSA had no control as to Lundell's supervision of Broomfield. Lundell and CSA were acting as independent contracting parties.

In *Bostic[k] v. Rappleyea*, 629 F.Supp. 1328 [1985], the plaintiff was terminated as an employee. In the present case, plaintiff continued as an employee. In *Bostic[k]*, the individual defendants held administrative positions with the employer. In the present case, Lundell was an independent contracting party as to the employer.

The leasing arrangement used by Lundell to obtain the services of Broomfield could not have been for the purpose of avoiding jurisdiction of the Arizona Discrimination in Employment Act because had he employed Broomfield directly, he would not have been subject to the act because of having fewer than 15 employees.

The motion of Defendants Desert Thoracic and Lundell for Summary Judgment is granted. Plaintiff's Cross–Motion for Partial Summary Judgment is denied.

Formal judgment in favor of Desert Thoracic and Dr. Lundell was entered on January 2, 1987, and Broomfield timely brought this appeal.

## BROOMFIELD'S CLAIM UNDER THE ARIZONA CIVIL RIGHTS ACT

■ We first consider whether the trial court erred in determining that Dr. Lundell was not subject to the provisions of the Arizona Civil Rights Act as an "agent" of CSA within the meaning of A.R.S. § 41–1461(2).[3] The Arizona Civil Rights Act contains the principal antidiscrimination provisions of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e *et seq.*), and federal case law is persuasive in interpreting Arizona's Act. *Sees v. KTUC, Inc.*, 148 Ariz. 366, 714 P.2d 859 (App. 1985); *Civil Rights Div. of the Arizona Dep't of Law v. Amphitheater Unified School Dist. No. 10*, 140 Ariz. 83, 680 P.2d 517 (App.1983).

Contrary to the trial court's analysis and Dr. Lundell's position on appeal, CSA need not have exercised "control" over Dr. Lundell's supervision of Broomfield in order for Dr. Lundell to have functioned as an "agent" of CSA within the meaning of the Act. Moreover, the prevailing standard under Title VII does not limit "agent" status to "supervisory employees." Instead, the concept of "agent" under Title VII has been broadly construed to include any individual charged with responsibility for making or contributing to an employment decision for an employer. *McAdoo v. Toll*, 591 F.Supp. 1399 (D.Md.1984). The only limiting criterion for an "agent" within the Act is that he or she must have "participated in the decision-making process that forms the basis of the discrimination." *Hamilton v. Rodgers*, 791 F.2d 439, 443 (5th Cir.1986), quoting from *Jones v. Metropolitan Denver Sewage Disposal District*, 537 F.Supp. 966, 970 (D.Colo.1982). *Accord Bostick v. Rappleyea*, 629 F.Supp. 1328 (N.D.N.Y. 1985).

The essence of the alleged act of discrimination in this case was Broomfield's re-

---

**3.** A.R.S. § 41–1461(2) provides:
> In this article, unless the context otherwise requires:
> . . . .
> 2. "Employer" means a person who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, *and any agent of such person.* . . .

(Emphasis added.) Schlei & Grossman, *Employment Discrimination Law* (2d Ed.1983) states:

> It should be noted that the "agent" is an "employer" by virtue of its agency relationship with an "employer" which meets the number of employees requirement. Therefore, it is unnecessary that the agent separately meet the number of employees requirement.

At 1002–03. Both Broomfield and Dr. Lundell have apparently assumed that CSA met the fifteen-employee requirement of A.R.S. § 41–1461(2) at all times material to this appeal. We accordingly do likewise.

moval from employment in Dr. Lundell's office because she became pregnant.[4] As indicated above, Dr. Lundell shared with a representative of CSA any decisions concerning who would work in his office, and the determination of worker duty assignments was a joint function of Dr. Lundell and CSA. Further, as a matter of fact in this case, it was Dr. Lundell who actually made the decision that Broomfield would no longer continue to work as his personal scrub nurse. It is therefore clear that Dr. Lundell participated in the decision-making process that formed the basis of the alleged discrimination, and was accordingly an "agent" of CSA and a statutory "employer" for the purpose of Broomfield's discrimination claim under the Arizona Civil Rights Act.

We also reject Dr. Lundell's contention that he could not have been an "agent" of CSA because he and CSA were "independent contracting parties." Contrary to Dr. Lundell's implicit argument and the trial court's reasoning, there is no legal requirement that a person be an employee or servant of another in order to be his "agent." *See* A.R.S. § 41–1461(1), (2); *Lettich v. Kenway*, 590 F.Supp. 1225 (D.Mass. 1984) (each general partner in law partnership was an "agent" of the partnership and therefore an "employer"). *Cf. Mares v. Marsh*, 777 F.2d 1066, 1067 n. 1 (5th Cir. 1985) ("The strict common law 'agency' test generally has not been applied to federal social welfare and antidiscrimination legislation, since it is considered inconsistent with the remedial purposes behind such legislation.").

Because we determine that Dr. Lundell was an "agent" of CSA and therefore an "employer" within the meaning of A.R.S. § 41–1461(2), we need not consider Broomfield's contentions that Dr. Lundell and CSA were "joint employers" and that Dr. Lundell could be found liable because he blocked access to a job market within *Sibley Memorial Hosp. v. Wilson*, 488 F.2d 1338 (D.C.Cir.1973).

### BROOMFIELD'S CONTRACT CLAIMS

We next consider whether the trial court erred in granting summary judgment for Dr. Lundell on Broomfield's claims for breach of an employment contract and breach of the duty of good faith and fair dealing. Broomfield argues that an express or implied contractual relationship between Broomfield and Dr. Lundell arose out of the employee leasing arrangement between CSA and Dr. Lundell, and her own employment relationship with CSA. Alternatively, Broomfield argues that she was a third party beneficiary of the contract between Dr. Lundell and CSA. Broomfield appears to maintain, although she does not expressly so articulate, that she was therefore in a position to recover damages from Dr. Lundell for breach of contract, and that the trial court erred in entering summary judgment against her on that claim. In response, Dr. Lundell argues that the unambiguous language of the "Staffing Contract" between Dr. Lundell and CSA and the "Employment Agreement" between CSA and Broomfield fails to support the existence of any implied contract between Broomfield and Dr. Lundell or any third party beneficiary rights in favor of Broomfield.

We cannot agree that the interposition of CSA in the continuing relationship between Dr. Lundell and Broomfield, for purposes unrelated to the day-to-day working relationship between them as surgeon and scrub nurse, legally operated to destroy their "employment" relationship for all

---

4. A.R.S. § 41–1463(B) provides in part:
It is an unlawful employment practice for an employer:
    1. To fail or refuse to hire or to discharge any individual *or otherwise to discriminate against any individual* with respect to his compensation, *terms, conditions* or privileges *of employment* because of such individual's race, color, religion, *sex,* age, handicap or national origin.
    2. To limit, *segregate* or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or *otherwise adversely affect the individual's status as an employee,* because of such individual's race, color, religion, *sex,* age, handicap or national origin.

purposes. The record makes it quite clear that the employee leasing arrangement with CSA did not alter the essential nature of Dr. Lundell's office operation or his working relationship with Broomfield.

■ The question of whether a contractual relationship of some kind continued to exist between Dr. Lundell and Broomfield, however, is not essential to resolving the question presented. Even if we assume that Broomfield remained Dr. Lundell's "employee," the record and the applicable case law clearly sustain the trial court's decision to enter summary judgment for Dr. Lundell on Broomfield's claim for damages for breach of contract and the duty of good faith and fair dealing. In *Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 710 P.2d 1025 (1985), the supreme court discussed at some length the implied-in-law covenant of good faith and fair dealing and the circumstances under which its breach may result in liability for tort or contract damages. In the course of its discussion, the court stated:

> We ... recognize an implied covenant of good faith and fair dealing in the employment-at-will contract, although that covenant does not create a duty for the employer to terminate the employee only for good cause. The covenant does not protect the employee from a "no cause" termination because tenure was never a benefit inherent in the at-will agreement. The covenant does protect an employee from a discharge based on an employer's desire to avoid the payment of benefits already earned by the employee, such as the sales commissions in *Fortune [v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977)], but not the tenure required to earn the pension and retirement benefits in *Cleary [v. American Airlines,* 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (1980)]. Thus, plaintiff here has a right to receive the benefits that were a part of her employment agreement with defendant Hospital. *To the extent, however, that the benefits represent a claim for prospective employment, her claim must fail.* The terminable-at-will contract between her and the Hospital made no promise of

continued employment. To the contrary, it was, by its nature, subject to termination by either party at any time, subject only to the legal prohibition that she could not be fired for reasons which contravene public policy.

(Emphasis added.) *Id.* at 385–86, 710 P.2d at 1040–41. In this case Broomfield's complaint alleged that she

> has been and is being deprived of income in the form of wages, retirement benefits, future wages, seniority, and other benefits due her as a worker, in an amount to be presented by proof at trial and after discovery herein.

Broomfield did not allege that Dr. Lundell had failed to accord her wages or other benefits she had already earned, and her complaint did not seek reimbursement of any such loss. Instead, the damages she sought to recover exclusively reflected a claim for prospective employment, which *Wagenseller* makes clear is relief to which she was not entitled. The trial court did not err in awarding Dr. Lundell summary judgment on Broomfield's claim for damages for breach of contract and of the duty of good faith and fair dealing.

## BROOMFIELD'S WRONGFUL DISCHARGE CLAIM

■ Finally, we examine Broomfield's contention that the trial court erred in granting summary judgment against her on her tort claim for damages for wrongful discharge in violation of the statutory public policy against employment discrimination based on sex.

In *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. at 376–81, 710 P.2d at 1031–36, our supreme court adopted the "public policy exception" to the employment-at-will doctrine. *See generally* Note, *Development of the Public Policy Exception to the At–Will Doctrine,* 29 Ariz.L. Rev. 295 (1987). *Wagenseller* thereby modified the common law employment-at-will doctrine by holding that an employer may fire an at-will employee for good cause or for no cause, but may not do so for a

cause that violates public policy. The court stated:

[I]n an at-will hiring we continue to recognize the presumption or to imply the covenant of termination at the pleasure of either party, whether with or without cause. Firing for bad cause—one against public policy articulated by constitutional, statutory, or decisional law—is not a right inherent in the at-will contract, or in any other contract, even if expressly provided. *See* 1A A. Corbin, *Contracts* § 7; 6A A. Corbin, *Contracts* §§ 1373–75 (1962). *Such a termination violates rights guaranteed to the employee by law and is tortious.* See Prosser & Keeton on Torts § 92 at 655 (5th ed. 1984). (Emphasis added.)

147 Ariz. at 381, 710 P.2d at 1036. The *Wagenseller* court held that the plaintiff could establish a claim in tort for wrongful discharge if she could prove she had been fired because she refused to participate in activities which arguably would have violated public policy, i.e., Arizona's indecent exposure statute, A.R.S. § 13–1402.

In the present case Broomfield argues that if Dr. Lundell terminated her employment for reasons that constituted discrimination based on sex, he thereby violated the public policy established by the Arizona Civil Rights Act and may be held liable in tort for wrongful discharge pursuant to *Wagenseller.* Although Broomfield recognizes that the Arizona Civil Rights Act itself provides administrative and judicial remedies for employment discrimination, including injunctive relief and reinstatement with back pay, she argues that the Arizona legislature did not intend to "... preempt the common law or forbid judicial recognition of supplemental rights and remedies ... which might exist in the future under Arizona's common law." Dr. Lundell argues in response that Broomfield reads *Wagenseller* far too broadly, and that allowing a tort claim for wrongful discharge under the circumstances of this case would effectively supersede the legislative scheme embodied by the Arizona Civil Rights Act. In support of his argument Dr. Lundell contends that, "The Act ... specifically provides a cause of action and

sets forth remedies available to employees and individuals who claim they have been the subject of employment discrimination by statutorily defined employers." Dr. Lundell further contends that "[a] reading of *Wagenseller,* whereby its holding allows an employee to fashion a remedy in countervention to the Act would, in effect, supplant the legislature's enactment and clear intent." In essence, Dr. Lundell's position is that the Arizona Civil Rights Act preempts the maintenance of a tort action for wrongful discharge.

The appellate courts of Arizona have not considered the specific question of whether an alleged violation of the public policy established by the Arizona Civil Rights Act against employment discrimination can support a tort claim for damages for wrongful discharge. Although the precise question has not been presented, we conclude, after reviewing our supreme court's decisions in *Wagenseller, supra,* and *Ford v. Revlon, Inc.,* 153 Ariz. 38, 734 P.2d 580 (1987), that such a claim may be brought and that the Arizona Civil Rights Act with its articulated remedies does not preempt the maintenance of a tort action for wrongful discharge.

In *Ford v. Revlon,* our supreme court upheld a judgment against (Revlon) for intentional infliction of emotional distress. The claim was predicated upon alleged acts of sexual harassment. In addition to her state tort claim, Ford had filed a federal Title VII claim, based on the same facts. Although it appears from the decision in *Revlon* that the argument was made that the filing of a federal civil rights claim precluded the maintenance of a state tort claim, our supreme court stated:

Concurrent with her state tort claim, Ford filed a federal Title VII claim based upon the same facts; Revlon contends that the dual filing is inappropriate. As the trial court noted, the exercise of dual jurisdiction in federal Title VII and state tort claims is entirely appropriate. *Guyette v. Stauffer Chemical Co.,* 518 F.Supp. 521 (D.N.J.1981); *Stewart v. Thomas,* [538 F.Supp. 891 (D.D.C.1982)]. We find no error in bringing the action in

both state and federal courts based upon two separate and distinct causes of action.

153 Ariz. 38, 44, n. 1, 734 P.2d 580, 586, n. 1.

More recently, the United States Court of Appeals for the Ninth Circuit in *Bernstein v. Aetna Life and Casualty,* 843 F.2d 359 (9th Cir.1988), in a summary judgment context, ruled that the Arizona Civil Rights Act did not preempt the plaintiff's wrongful discharge claim. In so ruling, the Ninth Circuit acknowledged that no appellate court in Arizona "... has addressed the issue of whether the ACRA [Arizona Civil Rights Act] preempts common law tort claims." In determining what the Arizona Supreme Court would rule, the Ninth Circuit considered the Arizona Supreme Court's decision in *Ford v. Revlon, supra,* along with the implication of that decision. The court first acknowledged that what the Arizona Supreme Court did rule in *Revlon* was that the plaintiff was free to file a tort claim in state court in addition to her Title VII action in federal court. It then determined that the ruling in *Ford* had some bearing on the issue of whether the Arizona Civil Rights Act preempted the tort claim stating:

, The ruling in *Ford,* that it is permissible to bring an action in both state and federal courts based upon two separate and distinct causes of action does, however, have some bearing on this issue. Arizona courts have ruled that the ACRA is "substantially identical" with federal legislation, that the "Arizona legislature intended to accomplish the same objectives" and that federal precedent under Title VII is "instructive and apposite." *Civil Rights Div. v. Superior Court,* 146 Ariz. 419, 424, 706 P.2d 745, 750 (Ct.App. 1985). 843 F.2d at 364.

The *Bernstein* decision then proceeded to discuss established federal law holding that Title VII does not preempt state tort remedies. It also discussed the proposition of whether, under the federal law analogy or under Arizona's rules there is preemption, stating:

It is well-established that Title VII does not preempt state common law remedies.

*See Cancellier v. Federated Dep't Stores,* 672 F.2d 1312, 1318 (9th Cir.) ("The ADEA does not preempt the award of tort damages on pendent state claims."), cert. denied, 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982); *See Kelly v. American Standard, Inc.,* 640 F.2d 974, 983 (9th Cir.1981); *see also* 42 U.S.C. § 2000e–7 (1982) (specific non-preemption clause for Title VII actions). The court in Cancellier noted that remedies under the ADEA are strictly limited, and that punitive and emotional distress damages are unavailable. *Cancellier,* 672 F.2d at 1318. It is necessary, therefore, to examine both the rights created under the ACRA and the exclusivity of its remedies, to determine whether there is preemption under this analogy to federal law or under Arizona's own rules for preemption. *See Register v. Coleman,* 130 Ariz. 9, 633 P.2d 418 (1981); *Valley Drive–In Theatre Corp. v. Superior Court,* 79 Ariz. 396, 400, 291 P.2d 213, 215 (1955) ("[W]hen a statute creates a right and also provides a complete and valid remedy for the right created, the remedy thereby given is exclusive."); *Mosher v. Conway,* 45 Ariz. 463, 473, 46 P.2d 110, 114 (1935) (preemption where it is "clearly indicated [that there is a] single complete and adequate remedy."); *National Sur. Co. v. Conway,* 43 Ariz. 480, 487, 33 P.2d 276, 278 (1933) ("where statutory right is given, with statutory remedy provided to enforce that right, the parties to whom the right is given are limited to the remedy provided by statute"). 843 F.2d at 364–65.

In concluding that the Arizona Civil Rights Act did not preempt the maintenance of a tort claim for wrongful discharge, the court in *Bernstein* thus stated:

Moreover, the clear ruling of the Arizona Supreme Court in *Ford* is that neither Title VII nor the ADEA preempts state common law causes of action. 153 Ariz. at 44 n. 1, 734 P.2d at 586 n. 1. The implication in *Ford,* therefore, is that the ACRA did not create the right upon which Berstein is claiming. Any other reading of *Ford* would mean that the Arizona Supreme Court was encouraging parties to simply ignore the ACRA and

to proceed simultaneously under both the federal laws and state tort remedies. We find that the ACRA did not create the right upon which Bernstein depends and that his tort claim is not preempted, irrespective of the exclusivity of the remedies provided in the ACRA. 843 F.2d at 365.

We agree with the Ninth Circuit Court's ruling in *Bernstein* along with its supporting analysis especially in light of the Arizona Supreme Court's rulings in *Wagenseller, supra,* and *Ford.* Our state legislature in enacting the Arizona Civil Rights Act has clearly established a public policy against employment discrimination. Although the Act provides administrative and judicial remedies for employment discrimination, these remedies may, at times, prove to be inadequate. We hold that the Arizona Civil Rights Act does not preempt a tort action for wrongful discharge. We base this on the absence of express language in the Act indicating preemption as well as the decisions in *Wagenseller, Ford,* and *Bernstein.* Accordingly, the trial court improperly granted summary judgment against Broomfield on her tort claim for wrongful discharge.

█ Both Broomfield and appellees request awards of attorney's fees on appeal pursuant to A.R.S. §§ 12–341.01(A) and 41–1481(J). In the exercise of our discretion, we deny appellees an award of attorney's fees under A.R.S. § 12–341.01(A). We grant Broomfield an award of attorney's fees under A.R.S. § 41–1481(J). However, this award is limited to services reasonably incurred with respect to Broomfield's claim for relief under the Arizona Civil Rights Act. Broomfield may establish the amount of her award by complying with Rule 21, Arizona Rules of Civil Appellate Procedure.

Affirmed in part; reversed in part; remanded for proceedings consistent with this opinion.

FROEB, P.J., and GRANT, J., concur.