Karen FLANAGAN, Plaintiff–Appellee,

v.

AARON E. HENRY COMMUNITY HEALTH SERVICES CENTER, et al., Defendants–Appellants.

No. 88–4310.

United States Court of Appeals, Fifth Circuit.

July 13, 1989.

---

Johnnie E. Walls, Jr., Tyree Irving, Greenville, Miss., for defendants-appellants.

Charles M. Merkel, John H. Cocke, Clarksdale, Miss., for plaintiff-appellee.

Before ALDISERT *, REAVLEY, and HIGGINBOTHAM, Circuit Judges.

REAVLEY, Circuit Judge:

Dr. Karen Flanagan, a white physician, alleged claims of racial discrimination and breach of contract against the Aaron E. Henry Community Health Services Center (Center) and its administrators, Dr. William Booker and Alpha Richard. The jury found in favor of Flanagan and awarded a total of $70,000 in compensatory and punitive damages. The defendants challenge the judgment claiming that Flanagan presented insufficient evidence to support the claims of liability and the damages

---

* Circuit Judge of the Third Circuit, sitting by designation.

awarded. We affirm but modify the damages award.

## I. *Background*

During her medical training, Flanagan received financial assistance from the National Health Service Corps, which was to be repaid with money or service. Pursuant to a settlement on terms of her obligation to the Corps, the Corps gave Flanagan the option of paying over $180,000 or serving three years in a medically deprived area. Flanagan opted for service and was matched with defendant Center. The Center serves primarily black and indigent patients in Clarksdale, Mississippi.

Flanagan began work at the Center in June 1986. The professional staff at the Center consisted of Richard as Executive Director, Dr. Booker as Medical Director, Flanagan as Staff Physician, and a number of nurses. Soon after her arrival, problems arose between Flanagan, Booker, and Richard. Neither Flanagan nor Richard had arranged for malpractice insurance to cover Flanagan at the Center; therefore, Flanagan was unable to work for the two weeks immediately following her arrival. In late August, Richard suspended Flanagan for four days without pay for infractions of the Center's policies; Richard found the discipline warranted by Flanagan's failure to follow a dress code, failure to get authorization for a dietician's lecture to the nurses during business hours, and failure to get adequate approval before leaving the Center during business hours. It is clear that the parties did not work in harmony.

Soon after the disciplinary suspension was served, Richard gave Flanagan a set of conditions for continued employment and placed her on 30 days probation. Flanagan responded without promising total compliance with the conditions and was soon served with 30 days notice of termination. At her request Flanagan received a hearing before the Center's board of directors. The board voted 5 to 4 to uphold Richard's actions. Flanagan's termination was effective October 31, 1986.

Flanagan brought this action in federal district court alleging a breach of contract and racial discrimination in her employment violative of 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e–2. The jury found in favor of Flanagan against Richard and Booker on the claim of racial discrimination and awarded $25,000 in damages; on the breach of contract claim, the jury found in favor of Flanagan against the Center and awarded $25,000 in damages; on the claim for punitive damages under § 1981, the jury assessed $10,000 against Richard and $10,000 against Booker.

The district court amended the judgment, upon Flanagan's motion, to extend liability to the Center for compensatory and punitive damages based on the findings of racial discrimination. The defendants' motions for judgment notwithstanding the verdict, a new trial, and a reduction in damages were denied. The defendants appeal from the judgment against them claiming the district court erroneously denied their motions on the contract and discrimination claims; further, the defendants contend insufficient evidence exists to support the award of damages.

## II. *Discussion*

### A. *Racial Discrimination*

■ To prove an allegation of racial discrimination Flanagan must show that she belonged to a racial minority within the Center, she was terminated from a position for which she was qualified, and she was replaced with someone not in her protected class; the defendants can rebut the resulting inference of discrimination by articulating a nondiscriminatory reason for Flanagan's termination; Flanagan, then, must show that the defendants' purported reason is a pretext for discrimination. *See Whiting v. Jackson State University*, 616 F.2d 116, 120–21 (5th Cir.1980); *see also McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Guillory v. St. Landry Parish Police Jury*, 802 F.2d 822, 824 (5th Cir.1986), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987). When 42 U.S.C. § 1981 and Title

VII are alleged as parallel bases of relief, the same elements of proof are required for both actions. *See Comeaux v. Uniroyal Chemical Corp.,* 849 F.2d 191, 192 n. 1 (5th Cir.1988); *Hamilton v. Rodgers,* 791 F.2d 439, 442 (5th Cir.1986) (citing *Whiting v. Jackson State Univ.,* 616 F.2d 116, 121 (5th Cir.1980)). Most of the elements of Flanagan's claim are not contested. Flanagan was the only white employee at the Center; she was terminated from her position as staff physician; she was a qualified and competent physician; and, she was replaced by a black doctor. The defendants' only contention is that the evidence is insufficient to support the jury's finding that Flanagan's termination was the result of racial discrimination.

All the evidence must be reviewed in the light most favorable to the jury's verdict and the verdict must stand unless the evidence points "so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969). Flanagan presented evidence of her disparate treatment in relation to other black employees. For instance, Ellery Gray, the director of the Center prior to Richard, informed Flanagan that her salary would be $50,000. The amount of federal funds budgeted to the Center for Flanagan's salary, and the amount for the individual salaries of two more doctors at an affiliated clinic in Tunica, was $50,000. Richard later drafted Flanagan's contract, however, to provide a salary of $46,000. The two new doctors at the Tunica clinic, both black, received $50,000 annual salaries. The Center raised the salary of Dr. Jefferson, the black physician who replaced Flanagan at the center, to $51,000 less than a week after her arrival.

In other aspects, the defendants handled Flanagan's employment differently than the employment of black employees. Flanagan was refused continuing education time while Dr. Booker took a number of trips for seminars and conferences. The evidence tended to prove a lackadaisical attitude of Richard and Booker toward violations of the rules by the doctors at the Tunica clinic while imposing harsh reprimands and suspensions on Flanagan for seemingly minor infractions of the rules. For example, the doctors in Tunica did not receive hospital privileges as required by their contracts until after this litigation was initiated. This meant they were not on call for the hospital emergencies of their patients. The doctors were not pressured to correct the situation nor were their salaries adjusted downward as provided by their contracts. Flanagan, on the other hand, was on call every other night and every other weekend.

In addition, Flanagan provided witnesses who testified that both Booker and Richard displayed racial animosity toward her. Dr. Harris, a black physician at the Clarksdale hospital received a call from Booker about the care provided to a patient. Booker allegedly accused Dr. Harris, in reference to Dr. Flanagan, of "siding with the white bitch." A nurse at the center testified that Richard prepared the staff for Flanagan's arrival by telling them that Flanagan was prejudiced and would be difficult to work with.

Other incidents of animosity, with each side telling its own version, were recounted to the jury. The defendants presented evidence of Dr. Flanagan's insubordination and misconduct, which they claimed to be the basis of her termination. The jury credited Flanagan's evidence of racial discrimination and dismissed the reasons presented by the defendants as pretextual. We hold that Flanagan presented sufficient evidence of intentional discrimination to support the jury's verdict on this claim.

■ The defendants next challenge the district court's post-verdict order applying the doctrine of respondeat superior and holding the Center to be jointly and severally liable with Booker and Richard on the claims of racial discrimination. Title VII liability is based on the actions of the employer. *See* 42 U.S.C. § 2000e-2(a)(1). Richard and Booker are liable only as agents of their employer, the Center. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91

L.Ed.2d 49 (1986); *Hamilton,* 791 F.2d at 442–43. The authority of both Booker and Richard over the employment status of Flanagan, and their almost unfettered control over the operations of the Center, place them in an agency relationship with the Center. Therefore, the Center's liability as principal under Title VII is clear.

█ Because punitive damages are not available under Title VII, *see Bennett v. Corroon & Black Corp.,* 845 F.2d 104, 106 (5th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989), we also should determine whether, under § 1981, the district court correctly held the Center, a private employer, liable for the acts of Richard and Booker, supervisory employees.[1] This court has held that vicarious liability against a public employer is not allowed under § 1981. *See Jett v. Dallas Independent School Dist.,* 798 F.2d 748, 762 (5th Cir.1986), *reh'g en banc denied,* 837 F.2d 1244, 1248, *aff'd in part and remanded in part,* —— U.S. ——, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Explicitly left open by the United States Supreme Court and this court, however, is whether the doctrine of respondeat superior applies against a private employer under § 1981. *See General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 395, 102 S.Ct. 3141, 3152, 73 L.Ed.2d 835 (1982) ("On the assumption that *respondeat superior* applies to suits based on § 1981, there is no basis for holding ... the employers ... liable under that doctrine without evidence that an agency relationship existed."); *Jett,* 798 F.2d at 763 (5th Cir.1986), *reh'g en banc denied,* 837 F.2d at 1248 n. 4 (citing *General Building Contractors Ass'n v. Pennsylvania*). Other circuits have held that, based on the doctrine of respondeat superior or general principles of agency law, liability may be imposed under § 1981 against a private employer for the acts of an employee. *See Vance v. Southern Bell Telephone and Telegraph Co.,* 863 F.2d 1503, 1512 (11th Cir.1989) (corporate employer may be held liable in § 1981 claim

under two theories, "through *respondeat superior* [for the discriminatory acts of employees where] ... the employer knew or should have known" but fails to take remedial action and through general agency principles for the acts of supervisors); *Berger v. Iron Workers Reinforced Rodmen Local 201,* 843 F.2d 1395, 1430 (D.C. Cir.1988) (applying agency law, international union may be held liable if it knowingly authorizes or approves of local's acts); *Springer v. Seaman,* 821 F.2d 871, 881 (1st Cir.1987) (in action against post office, court held that "doctrine of respondeat superior is applicable to claims brought under ... § 1981"); *Hunter v. Allis–Chalmers Corp., Engine Div.,* 797 F.2d 1417, 1422 (7th Cir.1986) (stating in dicta that, under agency principles, the deliberate acts of supervisors are the deliberate acts of the private employer); *Mitchell v. Keith,* 752 F.2d 385, 388–89 (9th Cir.) (under § 1981, liability based on "respondeat superior" may be imposed against private employer), *cert. denied,* 472 U.S. 1028, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985); *Miller v. Bank of America,* 600 F.2d 211, 213 (9th Cir.1979) ("respondeat superior" applies to private employers for actions of supervisors in § 1981 actions).

The Supreme Court clearly implied that agency principles will apply if liability is to be imposed against a defendant under § 1981 for the acts of another. *General Building Contractors Ass'n,* 102 S.Ct. at 3151–52. In *General Building Contractors Ass'n,* the Supreme Court held that § 1981 can be violated only by purposeful discrimination. *Id.* at 3150. The imposition of vicarious liability, or respondeat superior, was rejected in that case absent the element of control required in an agent-principal or master-servant relationship. *Id.* at 3151–52. Control or the right to control is vital to such agency relationships. The Court held that purposeful discrimination by an employer or other cannot be found without, at the least, a finding of

---

**1.** The Center complains only of its liability under the statutes and makes no objection to the imposition of the punitive damages portion of the award. For that reason we do not consider

the correctness of the district court's punitive damage award without a supporting finding by the jury.

an agency relationship. Whether the existence of such a relationship is sufficient to find liability under § 1981 was not determined by the Court.

Following *General Building Contractors Ass'n* and relying on agency law, the D.C. Circuit held that "an international union may be liable under § 1981 if, with knowledge of the surrounding circumstances, it authorizes, ratifies, or approves a local's actions the effects of which are sufficient to establish a claim of intentional discrimination against the local." *Berger*, 843 F.2d at 1430 (citing Restatement (Second) of Agency §§ 212, 216 (1958)). We agree with this approach in that it imposes responsibility on the principal for the acts of the agent while observing the requirement of intentional discrimination under § 1981.

A problem with the district court's characterization of the employer's liability in terms of respondeat superior is that the doctrine, and vicarious liability in general, connotes a degree of strict liability. *See* W. Prosser, *Handbook on the Law of Torts*, § 69 at 459 (4th ed. 1971). Because each defendant must be found to have intentionally discriminated against the plaintiff, strict liability under § 1981 is incongruous. The Seventh Circuit emphasizes the distinction between holding an employer responsible for failing to prevent campaigns of harassment by its employees (direct liability based on an affirmative duty) and holding it responsible for the deliberate acts of its supervisory employees (direct liability based on agency principles). *See Hunter*, 797 F.2d at 1423. The finding of intentional discrimination necessary to a § 1981 claim demands a closer look at the relationship between principal and agent. Because the agency relationship between the supervisors of the Center, Booker and Richard, and the Center was so close that the deliberate acts of Richard and Booker were the deliberate acts of the Center, liability of the Center is clearly supported.

■ Richard and Booker exercised almost exclusive control over the functioning of the Center. Although a board of directors existed to ratify or approve funding and other administrative issues, the evidence showed that Richard and Booker initiated most actions especially those relating to employment. Testimony given at trial by board members showed that the board authorized Booker and Richard to make employment decisions and was not apprised of most decisions until well after the fact— if ever. Thus, in cases such as this one, where a clear agency relationship exists between the employer and supervisors with control over the operations of the employer and the employment status of the plaintiff, liability may be appropriately extended against the employer. We affirm, on the basis of agency principles and direct liability, the district court's imposition of liability against the Center for the racially discriminatory acts of Booker and Richard.

**B.** *Damages from Racial Discrimination*

■ The defendants contend that the award of compensatory damages to Flanagan is wholly without merit. They argue that she has provided no evidence of pain and suffering, mental anguish, emotional distress, or loss of wages. The district court's denial of the defendants' motion for new trial or a reduction in damages will not be disturbed absent an abuse of discretion. *See Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233, 1241 (5th Cir.1985). A jury's award of damages will not be set aside unless the award is "entirely disproportionate to the injury sustained." *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir.1983). The jury awarded $25,000 in compensation for the claims of racial discrimination.

The damages awarded for the racial discrimination suffered by Flanagan do not appear to be entirely disproportionate to her injury. A certain amount of emotional distress may be assumed from the racially motivated treatment she received from the defendants. *See Woods–Drake v. Lundy*, 667 F.2d 1198, 1203 (5th Cir.1982); *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir.1977). The jury could have found that Flanagan was injured by the stress of attempting to satisfy supervisors who harbored racial an-

imus toward her. Once Flanagan left the Center, she was confronted with the federal government's reinstatement of the obligation for over $180,000. The employment Flanagan found after her termination provided a comparable income at the cost of longer hours, a longer commute, and stressful working conditions. The jury could have found Flanagan was emotionally distressed by these events.

In addition, the jury could have found Flanagan should be compensated for other losses incurred as a result of the defendants' discrimination; these losses include her suspension from work for four days without pay, the value of the continuing education leave she never received, and the two weeks without pay when insurance was not ready upon her arrival. An award of $25,000 does not appear to be "entirely disproportionate" to her injuries as the jury may have found them. *See, e.g., Cowan v. Prudential Ins. Co. of America*, 852 F.2d 688, 690–91 (2d Cir.1988) ($15,000 to compensate effects of discrimination, which included mental distress, humiliation, and loss of self-esteem); *Rowlett v. Anheuser-Busch, Inc.*, 832 F.2d 194, 204 (1st Cir. 1987) ($123,000 not excessive compensation for distress from years of discrimination and resulting unemployment); *Hunter v. Allis-Chalmers Corp., Engine Div.*, 797 F.2d at 1425 ($25,000 for humiliation and distress not excessive). The district court did not abuse its discretion in denying the defendants' motion as to this aspect of the damages award.

### C.  *Breach of Contract*

■ The district court read the contract between Flanagan and the Center to require cause for termination. The contract explicitly designated the "Personnel Policies and Procedures," which Flanagan received upon her arrival at the Center, as the compilation of the policies, procedures, rules, and regulations referenced in the contract. A personnel manual, when incorporated into the contract, can create contractual obligations. *Perry v. Sears, Roebuck & Co.*, 508 So.2d 1086, 1088 (Miss. 1987). Section 19 C.(4) of the Center's Personnel Policies provides for dismissal of employees for cause, such as failure to meet work standards or misconduct. We will assume that the district court correctly held that the contract between Flanagan and the Center required termination for cause.

The jury, in finding racial discrimination, found the reasons offered by the defendants for Flanagan's termination were pretextual. This finding applies with equal force in the context of the breach of contract claim. Flanagan's termination as a result of racial discrimination is not a termination for good cause. Again, we assume that sufficient evidence exists to support the jury's verdict that Flanagan was terminated in breach of her contract.

### D.  *Damages for Breach of Contract*

■ The award of $25,000 for the breach of contract claim is not supported by the evidence. Flanagan claims that she lost "leisure time" as a result of her termination without cause in breach of the contract. This loss of leisure time allegedly occurred because she had to take employment at emergency rooms in different hospitals after leaving the Center. Flanagan testified that this work required longer hours, strenuous shifts under stressful circumstances, and long commutes. Flanagan earned approximately the same income she would have earned working shorter, less hectic days at the Center.

Flanagan does not present any figures to establish the value of lost leisure time nor does she, in any other way, substantiate her damages. For instance, Flanagan does not offer evidence of the hours she has worked since leaving the Center or the miles she has driven to and from her new jobs. "[D]amages for breach of contract must be proven with reasonable certainty and not based merely on speculation and conjecture." *Kaiser Investments, Inc. v. Linn Agriprises, Inc.*, 538 So.2d 409, 415 (Miss.1989). Flanagan had the burden to establish those damages which resulted from the breach. *Cannada v. Byrd*, 185 So.2d 919, 922 (Miss.1966). The jury's award of $25,000 can be nothing more than

**1238**

a guess. Flanagan did not carry her burden of proof and was entitled to no damages for breach of contract.

AFFIRMED as Modified. Judgment is rendered in favor of the plaintiff against the three defendants for $25,000 jointly and severally, and for $10,000 against each individual defendant jointly and severally with the Center, together with interest and costs.

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring specially:

I join the majority's opinion with the exception of the paragraphs discussing the imposition of liability on agency grounds. Although I agree with the majority's conclusions, I see no reason to depart from the general principles of agency law.

A principal is liable for the acts of an agent only if the agent's acts were within the line and scope of the agency relationship. Application of this general rule becomes more difficult where, as here, liability is predicated upon the commission of an intentional tort. Where the necessary intent bears no relation to the purposes of the agency relationship—as when one employee deliberately subjects another to racial insults and harassment—it will generally be the case that the principal will escape agency liability, although direct liability may apply in some cases. *See Hunter v. Allis–Chalmers Corp., Engine Div.,* 797 F.2d 1417, 1423 (7th Cir.1986). Before holding an employer liable for intentional discrimination under § 1981, it will thus be necessary to examine carefully both the scope of the agency relationship and the connection between that relationship and the intentional acts complained of.

When applied to the facts of this case, these principles yield the same conclusions reached by the majority, and for the same reason: "in cases such as this one, where a clear agency relationship exists between the employer and supervisors with control over the operations of the employer and the employment status of the plaintiff, liability may be appropriately extended against the employer," *supra,* 876 F.2d at 1236. Since standard agency law would reach the identical result arrived at by the majority, I would regard as dicta any suggestion that those standard principles do not apply in § 1981 cases.