**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

v.

**LOUISIANA NETWORK, INC.**

**Civ. A. No. 89–740–A.**

United States District Court, M.D. Louisiana.

Dec. 16, 1992.

---

Kathryn H. Colbert, New Orleans, LA, for plaintiff, E.E.O.C.

Charles R. Jones, New Orleans, LA, for intervenor, Debra Holden.

Murphy J. Foster, Baton Rouge, LA, for defendant, Louisiana Network, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

This matter is before the court for review of the report and recommendation of United States Magistrate Judge Stephen C. Riedlinger, submitted in his capacity as Special Master pursuant to 42 U.S.C. § 2000e–5(f)(5). The Equal Opportunity Commission has filed an objection to the report.

This action arises from charges filed by intervenor, Debra Holden, with the EEOC in connection with her employment as an anchor reporter by defendant, Louisiana Network, Inc., a radio broadcasting station. The Commission claims that defendant violated Title VII of the Civil Rights Act by paying Holden and other black "anchor reporters" less than white "anchor reporters" on the basis of their race. Following a three-day evidentiary hearing, the special master issued an extensive report recommending that judgment be entered in favor of defendant, Louisiana Network, and against plaintiff, Equal Employment Opportunity Commission, and intervenor, Debra Holden.

Essentially, the special master found that plaintiff made out a prima facie case by showing that three white anchor reporters, Beverly Barker, Gina Logue and Richard Hunter, were paid more than Holden and other black reporters. However, the special master agreed with defendant that the black reporters were not similarly situated in terms of their past work experience or as accomplished "on-air" performers as Barker, Logue and Hunter. Ultimately, the special master determined that plaintiff failed to prove that a discriminatory reason more likely than not motivated defendant's pay determinations or to show that defendant's reasons were pretextual.

■ The court has carefully reviewed the report, plaintiff's objections and the record, with specific attention to the factual errors assigned by plaintiff. Plaintiff essentially takes issue with the numerous credibility choices made by the special master and has not shown that any of his ultimate factual determinations are clearly erroneous.[1] Under Fed.Rule Civ.Proc., Rule 53, the court is required to accept the factual findings of the special master unless clearly erroneous.

While plaintiff relies on the proffered testimony of Karen Profita, Don Peterson and Florence Rousseau, as showing racial animus on the part of Rigell and Patton, plaintiff has not shown that the special master erred in excluding this testimony. Moreover, even if admitted, that testimony has little significance in view of the fact that Rigell and Patton were not actively involved in negotiating particular salaries of the anchor reporters.

The court further finds that the report is legally correct. The main error of law assigned by plaintiff is that the special master mistakenly assumed that the Equal Pay Act claims were still at issue. However, plaintiff basically agrees with the special master's legal analysis as to the Title VII claims. Nor does the court find any merit to plaintiff's arguments relating to the relevancy of evidence concerning other white anchor reporters, including James Engster, Teisha Davis and Pat Simon.

In short, the court finds that the report is legally correct and that the factual findings are not clearly erroneous. Accordingly, the report of the special master is hereby approved and adopted as the findings of fact and conclusions of law of the court as modified herein. Judgment will be entered in defendant's favor and this matter shall be dismissed.

## SPECIAL MASTER'S REPORT

RIEDLINGER, United States Magistrate Judge.

This matter is before the court following an evidentiary hearing held pursuant to 28

---

**1.** The court does agree with plaintiff that the magistrate judge apparently mistakenly states at page 31 of the report that **Rigell's** approval was a formality. He apparently meant to state that **Patton's** approval was a formality. See Tr. Vol. II, p. 152.

U.S.C. § 636(b)(2), before the magistrate judge sitting as a special master as provided in 42 U.S.C. § 2000e–5(f)(5). This court has jurisdiction under 28 U.S.C. § 1343(a)(4), 29 U.S.C. § 216(b), and 42 U.S.C. § 2000e–5(f)(1).

### 1. Background Facts

Defendant Louisiana Network, Inc. (LN) is a publicly licensed radio broadcasting station doing business in Baton Rouge, Louisiana. Intervenor, Debra G. Holden, was employed by LN. She filed a charge of discrimination with the Equal Employment Opportunity Commission on July 26, 1988, Exhibit P–1, alleging that since August 1987, LN paid her less than similarly situated white male employees.[1] Notice was provided to LN of Holden's charge under the Equal Pay Act and Title VII of the Civil Rights Act of 1964. Copies were sent to the news director, Jim Engster, and LN's vice president, Bill Rigell. Exhibit P–2, p. 3. Rigell responded to the charge on August 5, 1988, explaining LN's position. Exhibit P–4. The EEOC investigator, Maple T. Thomas, advised Rigell in a letter dated December 28, 1988, that, pursuant to the Commission's responsibility for enforcement of the Equal Pay Act and the Fair Labor Standards Act, as well as Title VII, the Commission would conduct an investigation to determine compliance under Title VII and the Equal Pay Act. Exhibit P–5. The EEOC conducted its investigation, but was unable to effect voluntary conciliation. The EEOC then filed this action. Holden intervened.[2]

### 2. Review and Evaluation of the Evidence

As a network radio station, LN provides radio news and sports broadcasts to its affiliates. The station's income is derived from advertising revenues. The amount of advertising revenue depends upon, among other things, the number of LN's affiliates. The more affiliates a station has, the larger its audience will be, as will the number of potential customers an advertiser's message will reach. News and sports broadcasts are prepared by anchor reporters, either hired on a part time or full time basis.[3]

#### A. Comparison of individual anchor reporters

There was an informal salary structure at LN when the plaintiff was initially hired on October 28, 1985, as a part time anchor reporter at $7.00 per hour. Between 1982 and 1990 starting pay for part-time anchor reporters fluctuated between $5.00 and $9.00 per hour. The starting pay for full-time anchor reporters who were being converted from part-time anchor reporters generally was based on the part time hourly rate, i.e., the hourly rate was converted to an annual salary, although not always the exact equivalent. The pay rate for newly-hired anchor reporters generally fell within a range of $14,000 to $16,000 per year, but could be higher.

Hiring decisions were made by the news director, so long as the salary offered fell within the salary range fixed by LN's upper management.[4] When a salary demand from a potential anchor reporter fell outside of the approved salary range, the news director sought approval from Rigell, the vice president in charge of station operation. Although Rigell had the authority to overrule a hiring decision made by the news director, he never did. Likewise, board chairman Tim Patten had the same authority because of his position, but he never exercised it either, and in fact testified that he never would have. TR Vol. 2,

---

1. The charge also complained about denial of a requested vacation. That matter was resolved prior to the evidentiary hearing.

2. Defendant does not dispute that it is subject to the provisions of the Equal Pay Act and Title VII. For purposes of this report, the EEOC and Holden will generally be referred to collectively as the plaintiff.

3. Testimony and exhibits sometimes used the term anchor editor. In this case, the terms are essentially synonymous. TR Vol. 3, p. 219. For purposes of this report, the term anchor reporter will be used.

4. For purposes of this report, upper management refers to LN's officers and directors above the news director in the chain of command. *See,* Exhibit P–16.

pp. 150–151. His approval of any employee's salary was only a formality within the company. TR Vol. 2, p. 155.

Both part-time and full-time anchor reporters were, generally, performing the same duties. Each was responsible for gathering information and preparing it for broadcast. The information was obtained through telephone or in-person interviews. Telephone interviews were made from LN's office. Personal interviews were done wherever the source was located. The amount of time an anchor reporter spent conducting telephone or in-person interviews depended upon the assignments given the anchor reporter by the news director or assistant news director. The number of newscasts an anchor reporter could produce depended upon the type of story being covered, whether the source could be interviewed by telephone or in person, and, of course, the reporter's technical skills. These functions—gathering the newsworthy material from the source and preparing the material for broadcast—were common duties of all the anchor reporters. They were also the same duties performed by Jim Engster when reporting sports stories in his capacity as sports director.

Overlaying these common duties were specific duties not performed by other anchor reporters, whether full or part time, or anchoring news or sports stories. If reporting on a particular news event required a personal interview, the anchor reporter obviously had to meet with the individual involved to conduct the interview, whereas another assignment might require only a telephone interview. Reporting on sporting events, which was done by both Engster and later Gina Logue, would require the reporter to attend the sporting event, sometimes during the weekend. Reporters assigned to cover legislative affairs at the state capitol might be required to work through the usual lunch hour or past normal business hours if the committee hearing or legislative session ran overtime. Also, depending upon which of three shifts the reporter was working, there were dif-

ferent office responsibilities. These included cutting stories from the newspaper, monitoring wire service reports, dividing audiotape into "actualities,"[5] and cleaning equipment.

Several full time anchor reporters also served in lower level managerial capacities, such as assistant news director, news director, and sports director. In these capacities, the anchor reporter also was responsible for supervision of other anchor reporters. As news director, Engster, and his predecessor, Beverly Joachim Barker, were responsible for hiring newsroom employees, completing employee evaluations, and making recommendations for wage increases, in addition to being generally responsible for the station's news and sports broadcasts. Exhibits P–9 a, b.

Anchor reporters hired by LN from 1982 through 1990 brought with them divergent educational backgrounds and work experiences. *See,* Exhibits P–6, 7, 13 and D–2; and the testimony of Holden, TR Vol. 1, pp. 24–27; Engster, TR Vol. 1, pp. 172–173; Barker, TR Vol. 2, pp. 18–22; TR Vol. 2, pp. 169–174; Terrell Covington, TR Vol. 2, pp. 202–210; Logue, TR Vol. 2, pp. 290–295; Richard Hunter, TR Vol. 3, pp. 105–110. Holden had a college degree in broadcast journalism, whereas Sylvia Clark Weatherspoon had taken courses in broadcast journalism and attended college for three years, but had no degree. Barker had a degree in speech and theater, but did not study broadcast journalism. Covington had a degree in speech and dramatic arts with a special concentration in television and radio production and news and had studied broadcast journalism. Logue had attended college for two years, majoring in communications, but did not have a degree. Hunter had a college degree in broadcast journalism.

The work histories of these anchor reporters reflect a wide variety of prior work experiences. A brief review demonstrates this diversity.

**5.** An actuality is a segment of an interview to be incorporated into the overall news or sports story.

Holden had worked as an intern with a local TV station for a few months prior to earning her degree. She then worked approximately ten months at a radio station as an anchor and general assignment reporter in Hammond, Louisiana. From there she moved to a television station in Jackson, Mississippi, where she worked for almost two and a half years. She was terminated from that job and was unemployed for about eight months prior to taking part time employment at LN in October 1985. Later she was converted to a full-time anchor reporter, effective March 17, 1986, at a salary of $15,000 per year.

Weatherspoon had worked as a news anchor at Baton Rouge radio station WJBO for two years as a reporter and anchor reporter, and before that for local radio station WTKL for about three and a half years doing newscasts and functioning as the news director. She started work at LN as a part time anchor reporter, earning $7.00 per hour, in September 1985. When she was converted to full time her salary became $14,000 per year.

Barker had extensive full-time radio experience beginning in the fall of 1975. She worked as an anchor reporter in Ohio, and two cities in Florida, including Miami, before coming to Baton Rouge in the fall of 1977. A year later, in October 1978, she was employed by LN as an anchor reporter. She stayed with LN until March 1981. Between then and December 1983, when she returned to LN, she wrote and produced commercials for the Mississippi Egg Marketing Board, then a client of the Louisiana Network/Mississippi Network. Barker earned $16,250 annually after her return to LN in December 1983 as a full-time anchor reporter.

Covington worked at radio and television stations while attending college. However, some of his experience was not relevant to the job of an anchor reporter.[6] After receiving his degree he worked in Dallas, Texas, at a community television and radio station and served as a VISTA volunteer, ending his VISTA training in Baton Rouge. Here he went to work for Louisiana Public Broadcasting as an associate producer. Next he worked for the state in an audio/video training program producing training tapes. Then he moved on to become the news director of a one man news staff at a pair of New Roads, Louisiana, radio stations for six months.[7] Covington's pay as a full-time anchor reporter for LN was $15,000 per year, equating to $7.45 per hour, when he started in September 1984.

Logue, who dropped out of college because of lack of money, started work at a Knoxville, Tennessee, automated AM station and then moved to a FM station in Nashville where she worked as a disc jockey. She moved to Atlanta and worked at a station from mid–1980 to early 1981, doing a morning news show and serving as the news director. Next, she worked a few months for CNN Headline News rewriting stories. In 1983, she became a news anchor and reporter at a Birmingham, Alabama, station. Disappointed with the Birmingham station's lack of emphasis on news, she moved to Montgomery where she worked for the Alabama Radio Network for two and a half years as an anchor reporter. She covered the state senate and anchored an average of three or four newscasts a day, and did some Saturday shifts. In September 1985 she started working for the Missouri Network, also a statewide radio network, as an anchor reporter. She stayed there for nine months before coming to LN in June, 1986.

Hunter's resume and testimony reflect his television and radio experience dating back to 1976.[8] Hunter was an anchor reporter or a news director everywhere he worked in radio or television from 1976 through September 1987 when he started work at LN on a part time basis. He had experience from March 1985 to December 1986 working for the Southern States Ra-

---

6. TR, Vol. 2, pp. 203–204.

7. Although much of Covington's testimony suffered from serious credibility problems, this aspect of it did not.

8. His resume also reflects his university grade point average (3.346 on a 4.0 scale), and his receipt of the Charles P. Manship Journalism Award in 1975.

dio Network.[9] His starting salary as a part-time anchor reporter in 1987 was $9.00 per hour. He earned $19,000 per year as a full-time anchor reporter when he replaced Logue in December 1988.

Engster worked as a United Press International part-time stringer following his graduation from college, and he also worked part time doing sports and news broadcasts at radio station WLUX in Baton Rouge. He began full time work with that station in August 1981, where he stayed until being hired by LN on February 28, 1983, as a full-time anchor reporter and sports director, earning $13,500 per year.

In addition to their educational backgrounds and work experiences, these anchor reporters also came to LN with differing personal traits and characteristics. Barker and Engster, as news directors, interviewed the applicants for the anchor reporter positions—Covington, Weatherspoon, Holden, Logue and Hunter—and assessed their speaking style and voice quality. Weatherspoon, Logue, and Hunter submitted audio tapes of their work also. For those anchor reporters who began as part-time employees but were later converted to full-time employees, the news directors and upper management at LN had an opportunity to observe their character and work habits.

Barker became news director in August 1984. TR Vol. 2, p. 23.[10] In an April 7, 1986 performance appraisal she noted that Holden had good motivation but needed work on the technical end to produce the best sound quality. She described the plaintiff as "defensive" about being corrected, and she "seems short at times with employees offering instruction [and]/or suggestion." Exhibit P–6. Barker noted that "this can cause tension & needs to be worked on." *Id.* She also noted that Holden needed to "raise her pitch slightly & brighten her tone. More clipped speech for better diction is recommended." *Id.*

There were two more performance appraisals of plaintiff Holden made shortly thereafter, both dated June 2, 1986. One was by Barker, the other by Engster. Barker noted improvement in Holden's reporting skills and that she was "losing her offensiveness toward correction & willingly incorporates suggestions given to her and to her work." Exhibit P–6. Engster noted Holden's reliability and attendance. Although he described her announcing skills as "adequate," she was able to prepare a broadcast quickly when necessary. Her rapport with coworkers had improved since her last evaluation and she was less sensitive to corrective criticism. Engster did note one incident where she had not replaced a broken ribbon on a UPI wire machine and that all sports copy should be placed on the designated clipboard, not strewn about the editor's table or tossed in the trash can. *Id.* The October 27, 1986 performance evaluation by Barker recognized Holden's significant improvement in her broadcasts and that she showed "excellent perception in reporting legislative actions." *Id.* Barker's last performance evaluation of Holden was dated July 10, 1987. She again noted Holden's strong reporting skills and described her as the "best field reporter" on the staff. Holden's "[t]onal quality and breath support," which Barker believed had been affected by Holden's pregnancy, had improved after her baby was born. Barker concluded by recommending that Holden receive a raise. *Id.* Engster agreed with the recommendation for the raise.

Engster's September 24, 1987 evaluation, the first one he did of Holden after he became news director, was basically complimentary, with only one minor suggestion for improvement. *Id.* His next evaluation, dated March 30, 1988, was less complimentary. He noted that "some affiliates are not satisfied with Debra's newscasts," and suggested more enthusiasm in her delivery. Her news judgment was good. Engster

---

**9.** Of all the witnesses, Hunter was the most credible and had the best memory for details.

**10.** In her capacity as news director she interviewed and hired Covington, Weatherspoon and

Holden. She also interviewed Logue, but because her salary request was beyond the previously approved salary range, the hiring decision was made by Rigell. TR, Vol. 2, pp. 34–38.

was troubled by Holden's lack of commitment regarding working the morning shift, even though she saw no problem working the 10 a.m.—7:00 p.m. shift. He described her as a "honest, conscientious and reliable employee."

Engster had a high opinion of Logue's on-air presentation. Her diction was flawless, her pronunciation was superb. She was lively on the air, clever in the way she put her newscasts together, and was an extremely good writer. Also, Engster added, Barker viewed Logue as a "superior anchor." TR Vol. 1, p. 180. By comparison, Holden had very little enthusiasm in her delivery. Her voice quality was not as strong as Logue's, Hunter's or Weatherspoon's. Generally, Engster believed, as an anchor reporter Holden was "below our standards." TR Vol. 1, p. 181.

Barker testified that Rigell also told her that the affiliates had complained about the voice quality of the news broadcasts generally, and she passed this along to the news room staff.[11] The complaints involved shoddy performance, poor timing, and stumbling over words. All of the newsroom staff was, she testified, guilty of those things.

The final differentiating factor among the anchor reporters hired by Barker and Engster was the difference in their bargaining positions. These differences included not just their prior educational backgrounds, work experiences, and personal characteristics or traits, but also included any willingness to negotiate a salary and the strength or weakness of the individual's negotiating position. There was a great deal of testimony regarding whether LN negotiated salaries or just announced what it was willing to pay a particular prospective employee.

When Holden was first hired as a part-time anchor reporter, she had been unemployed more than eight months. She heard about an opening at LN from an acquaintance, called and spoke to Barker and set up an interview with her. She was called back, asked if she wanted the job and was told it paid $7.00 an hour. Both Holden and Barker testified that Holden did not negotiate her salary.

Weatherspoon testified that she heard about a job opening at LN, or maybe saw something in the newspaper or someone told her about the opening. She applied for it and sent an audio tape and a resume to the station. Eventually she had an interview with Barker and was told what the salary would be.[12] There is no evidence that Weatherspoon sought, or even considered requesting, a higher salary.

Prior to going on LN's payroll as of September 3, 1984, Covington had last worked in radio in May 1983. In the interim he had a job which was not broadcast related with the South Baton Rouge Community Development Association. TR Vol. 2, p. 210. He did not recall whether he was responding to an advertisement, had heard about a job from someone else, or was making a general inquiry. He testified that he was told by Barker that there was a salary range of $15,000 to $17,000 and that his salary would be $15,000. Covington testified that he inquired about the basis for that salary and was told by Barker that "they didn't feel that I had enough—what was it—that I had really enough on-air experience...." TR Vol. 2, pp. 213–214.[13]

Unlike Holden, Weatherspoon and Covington, who were not employed in a radio or broadcasting job when they applied at LN for an anchor reporter position, Logue and Hunter had been actively sought by

11. The staff at that time, March 1986, consisted of Covington, Weatherspoon, Holden, Engster and Barker. TR, Vol. 2, p. 97. Engster was the assistant news director. *Id.*

12. Weatherspoon testified that she thought the salary was somewhere between $6.00 and $7.00 per hour, or about $13,000 per year. The evidence showed that her starting pay as a part-time anchor reporter was $7.00 per hour, and

when she was converted to a full time anchor reporter her salary became $14,000.00 per year. Exhibit P–7. On a 40–hour week basis, this equates to $6.73 per hour. *See*, Exhibit D–5.

13. Barker testified that the authorized starting salary range for full time anchor reporters was between $14,000.00 and $16,000.00. TR, Vol. 1, p. 25.

LN. Logue was working at the Missouri Network and was sending out tapes and resumes, applying for jobs elsewhere. TR Vol. 2, p. 295. It just so happened that at the same time LN was looking for an anchor reporter. *Id.* She sent a tape and resume to LN and was contacted by Barker. Because Logue could not take time off from work for an interview, the interview was arranged to take place on a weekend. Logue testified that she was earning $18,-500 a year and would not take less than what she was already making. TR Vol. 2, p. 296. Because the salary request was beyond the approved range for full time anchor reporters, Barker could not approve Logue's requested salary. Logue also was willing to do sports broadcasts, which Barker felt was a factor in her recommendation to hire Logue.

Engster was the news director who hired Hunter in December 1988 after Logue left. Hunter had previously worked at LN for a year, ending in September 1988. He was employed full time with WTGE radio when Engster approached him about a part-time anchor reporter job with LN. TR Vol. 3, pp. 136–137. Hunter testified that he negotiated a part-time salary of $9.00 per hour. His full-time salary of $19,000 per year was based on a 45 hour work week. This amount, Hunter explained, equated to $8.12 per hour. This salary was also negotiated. TR Vol. 3, pp. 155–156.

B. Proof of racial and sexual bias

Holden's charge of discrimination, and the EEOC's civil action, are based on the allegation that since August 1987 LN paid Holden at a lower rate than similarly situated white and male employees. Much of the testimony presented at the evidentiary hearing focused on the duties and responsibilities of LN's anchor reporters. Plaintiff highlighted the news gathering and reporting function of the anchor reporters, playing down office responsibilities and the on-air qualities of the broadcasts. Defendant focused on voice quality and reporting style, work experience and the station's needs.

Plaintiff sought to compare the black and white anchor reporter salaries for the period 1983–1990, Exhibit P–15, but excluded from comparison Engster, Tesha Davis, Pat Simon and John Filostrat, who are white. *See,* Exhibit D–5. Plaintiff offered no persuasive reason for doing so. Davis' experience and educational background were developed in her deposition. Exhibit P–17. Although there was very little testimony regarding the educational or work experience of Simon or Filostrat, there was no evidence that LN hired these persons or paid them an annual salary lower, on a hourly basis, than the plaintiff in order to affect the outcome of this case. Obviously, Engster's full-time starting salary was decided before Holden was even hired. The only logical reason for excluding Engster would be to keep his lower starting full-time salary from being considered. Including Barker, whose full-time starting salary was $16,250, would obviously benefit the plaintiff's Title VII claim but hurt the Equal Pay Act case since it was substantially higher than Holden's and Engster's full-time starting salaries. Yet, both became full-time anchor reporters in 1983, Engster in March and Barker in December.

The testimony offered to support the plaintiff's claims was riddled with contradictions, and overall is implausible and unpersuasive.

Holden testified that, in her experience, when a station comes under new management usually the entire newsroom staff is swept out. This, she contended, explains her termination from WJTV–TV in February 1985. Nevertheless, she acknowledged that the reason given for her termination was insubordination. TR Vol. 1, pp. 35–36, 27.

She testified that her full-time salary was based upon her part-time hourly rate of $7.00 per hour, multiplied by an eight hour day, five days a week, 52 weeks a year. The actual full-time salary was $15,-000.00 a year, whereas the salary based on a $7.00 per hour rate would only be $14,560 per year. Thus, her actual annual full time salary equates to $7.21 per hour. This is more than the initial annual salary, at a hourly rate, paid to Engster, Davis, Simon or Filostrat. Exhibit D–5.

Holden acknowledged that Barker told her in April 1986 that she needed to raise the pitch of her voice slightly, and brighten her tone. Holden claimed that her voice was what it was and she couldn't change it. TR Vol. 1, pp. 48, 52. Although Barker was generally supportive of her, Holden complained that Barker never offered to help her improve her voice qualities. *Id.* Holden testified that there were no other comments made about her voice. TR Vol. 1, pp. 52–53. However, in the March 30, 1988 performance appraisal, Engster noted the affiliates' dissatisfaction with her newscasts and suggested more enthusiasm in her delivery. Exhibit P–6.

Plaintiff offered testimony aimed at demonstrating the existence of racial bias or animus against Holden and blacks generally at LN. Holden cited an incident occurring in July 1988 when she requested a vacation. TR Vol. 1, pp. 74–77. Logue had already requested and been granted a vacation during the same week Holden requested to be off to attend a black journalists convention which she had attended previously. She met with Logue who agreed to switch dates. Rather than going directly to Engster, their immediate supervisor, the two of them went to see Rigell, who told them he had no problem if the dates were switched. When Engster learned about this, Holden testified, he stormed in and ordered Holden and Logue to meet him in his office. According to Holden, Engster became loud and belligerent. She attempted to locate Rigell, but he had gone to the post office. When Rigell returned, Engster met with him and shortly thereafter told Holden and Logue that neither one of them would be able to take off that week. Holden, nor anyone else testified, that Engster used any racial epithets during this incident. The incident, as described by Holden, Engster and Logue, does not support any finding of racial animus.

Holden testified she could not recall Engster making any racial slurs or comments or engaging in overtly racist conduct. However, she contended that comments made by Engster regarding employees not working on Martin Luther King's birthday and the way the station covered stories about David Duke support her belief that Engster is racially biased. TR Vol. pp. 86–88. Holden testified that the first year Martin Luther King's birthday was declared a holiday, a memorandum was issued advising employees that anyone who wished to take off that day would be allowed to do so. At that time there were three black newsroom employees, Covington, Weatherspoon and Holden. All three were allowed to take the day off. But, because Engster allegedly commented that "if Martin Luther King stood for everybody, then everybody should have the chance of take the day off, not just the blacks," Holden concluded Engster was racially biased.

This remark does not support a finding of racial bias. There was no testimony that any newsroom employee—black or white—who wished to take the day off was forbidden from doing so.

Holden and Engster obviously disagreed on the amount of news coverage which should have been given to David Duke, then a candidate for public office. Holden believed that LN was giving Duke too much coverage. She testified that Engster's persistence in "wanting to and actually putting David Duke on the air at the network certainly had a racist tenor to me, being black, because anybody who promotes what he says, in my opinion, has some racist tendencies." TR Vol. 1, p. 128.

There is no dispute that at the time Duke was making headlines and receiving extensive statewide media coverage. Holden was not the news director and did not have the responsibility for determining what news stories would be covered and with what frequency. While it may be Holden's opinion that Engster's decision to provide news coverage for Duke demonstrates "racist tendencies," her opinion is not supported by the credible evidence in this case. By her reasoning, every media organization in this country which published more than a sporadic account of Duke's political activities would be demonstrating "racist tendencies," a proposition which is clearly insupportable.

Plaintiff also claimed that reduction of coverage of sporting events at Southern University [14] demonstrated Engster's racist tendencies. According to Holden's testimony, when Engster took over as news director he stopped covering Southern University sports "more or less." TR Vol. 1, p. 128. He explained to her that LN's affiliates were not interested, but she "had a problem with that since most of our affiliates are in very small towns where there's only one radio station where everybody gets their local news, whether black or white." *Id.*

Again, Holden was in no position to dictate to LN the type of sports stories that would be covered. There is ample evidence in the record that Holden, and to an ever greater extent Barker, felt no need to be concerned about or responsive to the affiliates' criticisms, wishes or perceptions. TR Vol. 2, p. 134–135.

The testimony of Covington was also offered to establish racial bias. Covington testified that Engster told "off-color jokes." TR Vol. 2, p. 216. When pressed on cross examination to state whether Engster told these jokes before or after he was made news director, Covington responded that "I heard these remarks throughout out my tenure." TR Vol. 2, p. 217. He could not recall any jokes specifically. He recalled one instance in particular that had to do with a LSU football player who happened to be black. He could not remember the player's name, but thought it might be "Orlando." TR Vol. 2, p. 218. Supposedly, Engster made a joke about the player dropping a pass that had to do with the "ethnicity of their ability to hold onto things." *Id.*

Covington could only recall once or twice hearing anything which he believed constituted a racial remark, and then it would be something Engster would "mumble." TR Vol. 2, p. 219. Covington concluded his testimony with this assessment of Engster: "As I said, most of his jokes generally were—they were rather subliminally racist in that respect. Most people of any ethnici-

ty usually could kind of tell, you know, how it was intended; it was an insinuation." *Id.*

On cross examination Covington elaborated on this remark. He explained that Engster would still tell these jokes even though most of the staff was black because all of the staff was not always there at the same time. A lot of Engster's comments, according to Covington, would generally be directed at one person or to just the group in particular. Generally, the remark would be in reference to something, either on a news call or that came up as part of a news report, or just something he thought of as a joke. TR Vol. 2, pp. 223–224.

Covington's testimony does not support an inference that Engster harbored racial animus. Covington could not give any example of the allegedly off-color racial jokes told by Engster. Covington inferred that Engster allegedly told these jokes at least frequently over the course of several years, yet Holden testified she heard no racial remarks by him. She did not testify that she heard any jokes by Engster at all, much less construed any alleged joke as a racial slur. Covington's testimony about "subliminally racial" jokes might support some sort of racial witch hunt, but it does not support a finding that Engster made employment decisions based on race or harbored any racial animus against Holden or other blacks employed by LN.

Barker also offered testimony about racial remarks made by LN's upper management and Engster. She testified that during a meeting with Rigell he said that while he was in the Marine Corps he had trouble with blacks. She did not elaborate on the meaning of his remark, but it did stick in her mind. TR Vol. 2, p. 43. As a result of this remark, it made her "listen to what was being said around me, and to try to be as aware of what was going on around me as possible." TR Vol. 2, p. 44. In September 1986 Rigell spoke with Barker about the possibility of a layoff, and she suggested that if someone should be let go it

---

**14.** Southern University is a college located in Baton Rouge, Louisiana, whose students are predominantly black.

should be Logue. Barker testified that Rigell looked puzzled and asked why she recommended Logue. Her response was that Logue was the most recently hired, and therefore should be the first fired. TR Vol. 2, p. 48. Her impression from that conversation was that Rigell believed Barker had not given the "right answer, or the answer he expected." TR Vol. 2, p. 49.

Barker also testified about a discussion she had with Rigell concerning Holden's pregnancy. During the last week of October 1986 Rigell asked Barker whether she had discussed the possibility of an abortion with Holden. Barker testified that she had not had any discussion about this, and had no intention of discussing that with Holden, and did not feel that it was her place to ever discuss that with her. *Id.* Barker had no knowledge of anyone else ever discussing this subject of abortion with Holden. Holden herself did not testify that anyone at LN ever spoke to her about having an abortion, or suggested it directly or indirectly.

Barker admitted that she received criticism of Holden's performance. The person complained that her style was too aggressive and she was not tactful. One particular affiliate used to call up periodically and "rip me up one side and down the other for how stupid I was and what I wasn't doing right, and how he didn't like this or that. It was part of the job." TR Vol. 2, pp. 66–67. Similar comments were made about all the anchor reporters. One complained about Engster's sports performance because "he didn't sound as good as the anchor from New York." TR Vol. 2, p. 67. Nevertheless, as far as Barker was concerned, she did not give these complaints serious consideration when evaluating job performance. *Id.*

Barker testified that Engster told her that Rigell had said "it's a good thing Beverly [Barker] is quitting when she is, because if she had stayed, I would have either made her or told her 'lay off Debra.'" TR Vol. 2, p. 70. In response, she told Engster that if Holden were laid off she believed it would be racially motivated. Barker wrote a letter to that effect. TR Vol. 2, p. 71. The letter was written while Barker was still a management official at LN and when she anticipated Engster would become the news director. TR Vol. 2, p. 72. Yet, she did not give a copy of this letter to Holden nor tell her about it. She took a copy of the letter with her when she left LN.[15]

Barker testified that Holden was not the only anchor reporter criticized about the sound quality of his or her on-air voice. Covington's sound on the air was not his strength. TR Vol. 2, p. 100. He did not have a deep resonance. His diction was not always precise. She added that, at times, he was hard to understand. TR Vol. 2, pp. 100–101. But, she did not consider that Covington did not "sound white enough." TR Vol. 2, p. 101.

Barker herself acknowledged that she did not fit the criteria of a perfect radio news person. Her strength was her voice; her reporting skills were not as good as her on-air performance. She defined the "perfect radio news employee [as] someone who was a cracker jack ace reporter and sounded like Edward R. Murrow on the air. Okay. I mean, a wonderful voice." TR Vol. 2, p. 100.

Barker, as news director, was responsible for hiring Covington, Weatherspoon and Holden. She interviewed each of them. She acknowledged that sound quality was a factor in deciding whether to hire an anchor reporter, but added that LN was "usually hiring in a desperate situation and sometimes could not count voice quality as high." TR Vol. 2, pp. 113–114. Whether a person had a recognizable accent would, in her view, be a slight factor in the hiring decision, but "[a]gain, it depends on the news director. It depends on the accent, whether the accents affects diction." TR Vol. 2, p. 115. She, personally, "didn't care what the affiliates thought." *Id.* *See also,* TR Vol. 2, pp. 134–135.

Barker's testimony does not support a finding of racial animus. Her testimony is

---

**15.** No copy of the letter is contained in Holden's personnel file, Exhibit P–6. There was no testimony that either Rigell or Engster ever received this letter.

seriously contradictory within itself and also contradicts testimony of other witnesses relied upon by the plaintiff. Like Holden, Barker offered no testimony about off-color racial jokes allegedly told by Engster. Although Rigell never stated that Holden "didn't sound 'white enough,'" TR Vol. 2, p. 135, Barker perceived his comments about Holden's voice quality to mean just that. She admitted that her critique of Covington's sound quality could support the same conclusion about her, yet she denied that she considered herself a racist. *Id.* Her conclusion about Rigell's character is not supported either by his remark about the problem he had in the Marine Corps or his alleged comment about discussing abortion with Holden. There was no testimony about the nature of any problem Rigell might have had in the Marine Corps, and there was no testimony that he or anyone else ever spoke to Holden about having an abortion.

Barker clearly admitted that an anchor reporter's sound quality on the air was a legitimate factor in making employment decisions. She admitted that Holden's voice quality needed improvement.[16] Holden admitted that she was criticized about her voice quality, but basically refused to do anything about it. Barker testified that "[t]here are people from West Texas who specifically work on their voice quality to attain a voice that sounds like it came from Ohio." TR Vol. 2, p. 114. There was no testimony that LN ever offered any of its anchor reporters any professional assistance to improve their on-air voice quality. The record supports the finding that the plaintiff, having been clearly and repeatedly put on notice about deficiencies in her voice quality, failed to improve it sufficiently to satisfy LN, even though she did improve it somewhat. *See,* Exhibit P–6, Barker's performance appraisal dated July 10, 1987.

It is also clear that Barker did not take seriously complaints from affiliates. Although she knew that Rigell cared about

what the affiliates thought of LN, TR Vol. 1, p. 115, she dismissed his concern because he did not have a broadcast background, to her knowledge. *Id.* Rigell, she believed, was the first supervisor she had at LN with no broadcast experience. TR Vol. 2, p. 116. While it is true that Rigell lacked prior radio experience and had not taken any courses in broadcast journalism, shortly after he began working for LN as its controller, he became its vice president in charge of station operations. He is also a shareholder in the corporation and was on its board of directors. TR Vol. 1, pp. 164–270. Nevertheless, the lack of training or experience in broadcast journalism does not disqualify him from making management decisions at LN. Those decisions obviously encompass matters touching on the station's relationship with its affiliates. Barker's demonstrated lack of concern in this area does not support the finding that Rigell's consideration of the affiliates' criticisms was somehow based on racial animus. Some of the very same concerns voiced by Rigell, as well as Engster, about the on-air performance of Holden, Covington and other anchor reporters were admittedly valid. Yet, coming from Engster and Rigell, Barker perceived these as race-based comments; coming from her they were not. Neither the individual incidents about which Barker testified, nor her testimony collectively, supports a finding that any salary decisions made at LN were based on the race of the anchor reporter involved.

The contradictory and unpersuasive testimony of Holden, Barker and Covington regarding racial animus was further undermined by Logue's testimony. Beside the fact that Barker, Engster, and Rigell were eager to hire her, it is clear that she actually negotiated over her salary. TR Vol. 2, pp. 302, 308.

Logue complained to Rigell about "feeling very uncomfortable in the news room" which she attributed to "whatever disgrun-

---

**16.** Holden's voice quality was, indeed, justifiably criticized as muddy, unauthoritative and unenthusiastic. Careful attention was paid to the voice quality of those witnesses who held anchor reporter positions with LN. Based on her testimony, in comparison to that of Logue and Hunter, Holden's voice quality was noticeably inferior.

tlement Debra [Holden] was feeling and whatever disgruntlement Jim [Engster] was feeling with Debra." TR Vol. 2, p. 309. She could not recall any racially off-color joke of any sort told by Engster, but when he talked about David Duke, she "did find it a little bit alarming but I don't recall him saying anything vehemently racist or using any slurs." *Id.* Hunter testified that, from his perspective as a newsman at LN, he did not feel that he or anyone else at LN gave exorbitant or more than appropriate coverage to David Duke, contrary to Holden's opinion. TR Vol. 3, pp. 117–120.

Hunter testified that, in general, news directors and program directors put a lot of weight on how an individual sounds if the person is applying for an on-air job. TR Vol. 3, p. 137. After listening to the tape Hunter submitted when he applied for a part time job at LN in 1987, Engster told him that his voice sounded fine, although he did not recall Engster ever saying anything specifically that his voice had anything to do with his wage rate. Hunter did recall that when he was hired on a full-time basis Engster had to get permission from Rigell for the salary Hunter requested. Although he dealt mainly with Engster, he did talk to Rigell, but the salary was negotiated between himself and Engster. TR Vol. 3, p. 157. Hunter ended up accepting a salary lower than he wanted. *Id.*

It is significant that Hunter was hired initially on a part-time basis after Weatherspoon turned down the same part-time anchor reporter position. He had been earning $9.85 an hour working at WJBO/Southern States Radio Network. Engster testified that Weatherspoon was offered the same position before it was offered to Hunter at the same pay, $9.00 per hour, but turned it down. TR Vol. I, p. 234–238. According to Engster, he learned from Logue that Weatherspoon had declined LN's offer. Logue did not recall whether Weatherspoon had applied for the position, but thought she was offered the position before it was offered to Hunter. TR Vol. II, p. 133.

## 3. Findings of Fact

Much of the testimony offered by the parties was conflicting. Even some of the statistical evidence, such as dates of hire and starting salaries, was disputed. The factual findings are not intended to try and resolve every factual dispute contained in the evidentiary hearing record. Rather, only those factual findings necessary for a resolution of the plaintiff's claims and LN's defenses will be addressed. A preponderance of the credible evidence supports the following factual findings.

Anchor reporters at LN, whether working full time or part time, as either news reporters or sports reporters, were performing substantially equal work, in terms of the skill, effort and responsibility required by the jobs. Anchor reporters who also served as assistant news director, news director and sports director performed other functions, such as determining assignments, conducting employee evaluations, and making hiring, promotion and employment decisions. Anchor reporters serving in these dual capacities did not work in positions requiring equal skill, effort and responsibility as compared to other anchor reporters.

Although there was no formal, written salary plan at LN, there was an informal salary structure. Part-time anchor reporters, with one exception, started at $7.00 per hour. Holden was hired as a part-time anchor reporter in October 1985 at $7.00 per hour. Weatherspoon started as a part-time anchor reporter in September 1985 at $7.00 per hour. Hunter, the exception, was paid $9.00 when he started as an anchor reporter in September 1987. Davis was paid $7.00 per hour when she started as an anchor reporter in June 1988.

The performance of anchor reporters was reviewed periodically by the news director. These reviews were in writing and were discussed with the employee. These performance appraisals were used by LN's upper management to determine whether an employee should receive a promotion or a raise. While the skill, effort and responsibility required in the performance of all the anchor reporter positions was substan-

tially equal, the actual quality of the work product of the anchor reporters differed. Holden's on-air job performance was criticized repeatedly by the news directors who supervised her and also by LN's affiliate stations. Holden did not respond positively to critical comments about her on-air performance. Her voice quality resulted in on-air broadcasts accurately described as muddy, unenthusiastic and not authoritative. Nevertheless, she dismissed complaints from affiliates and made no effort to improve.[17]

When part-time anchor reporters were converted to full-time anchor reporters the hourly salary was converted to an annual salary. However, the conversion was not always precise. Holden was converted to a full-time anchor reporter on March 17, 1986, to fill a vacancy created when Weatherspoon resigned. Holden's annual salary was $15,000. This is $440 more per year than her hourly rate converted to an annual salary. By contrast, when Weatherspoon became a full-time anchor reporter in November 1985 her salary was $14,000 per year. Covington was hired as a full-time anchor reporter in September 1984. His starting salary was $15,000 per year. Barker returned to LN in December 1983 as a full-time anchor reporter earning $16,-250 per year. Engster started at $13,500 per year when he became a full-time anchor reporter in March 1983.

Gina Logue was hired as a full-time anchor reporter in June 1986 at a salary of $18,500 per year. Richard Hunter converted from part time to full time in December 1988 and was paid $19,000 per year.

The news director had the authority to hire part-time and full-time anchor reporters once upper management determined that another anchor reporter was needed. The news director could also determine the salary, provide it fell within a $14,000–16,600 range. This range was set by LN's upper management. If the news director wanted to hire a full-time anchor reporter at a salary higher than $16,000 per year, approval from LN's upper management was necessary. This approval would come from Rigell.

When the salary fell within the approved range, the exact salary was left up to the news director. Rigell's approval was a formality within the company and served as an authorization for the accounting department to pay the salary. The actual salary, as determined by the news director, was based on the employee's background, experience and abilities. This assessment included an evaluation of the person's on-air performance made from reviewing an audio tape submitted by the person, or from an interview.

The salary the person was requesting or already earning, if currently employed, was also considered in setting the rate of pay. For example, Holden and Weatherspoon were unemployed when they applied for work at LN. Davis had no radio experience other than part time or intern positions while she was at LSU earning her undergraduate degree. In contrast, Barker, Logue and Hunter had extensive radio experience which amply justified their higher salaries. Logue and Hunter had network radio experience. Both were employed when they were approached by LN. Logue was working at the Missouri Network earning $18,500 per year. She would not take less at LN than what she was already making. Barker recommended that LN hire Logue. Hunter was also employed full time at another radio station when he agreed to work at LN on a part time basis. He negotiated a salary of $9.00 per hour. Approximately a year later, in December 1988, Hunter negotiated a $19,-000 annual salary for a full time anchor reporter position at LN. The part time anchor position accepted by Hunter in 1987 was first offered to Weatherspoon, at the same pay, $9.00 per hour. At that time she

---

**17.** Holden's attitude may have been influenced by Barker, the news director when Holden was hired. Barker also gave little weight to comments and criticisms from the affiliates. Although Barker noted the deficiencies in Holden's attitude and job performance in the evaluations she completed, Barker labeled others' negative comments about Holden as racially biased. As noted in review of the evidence, Barker's perception is not supported by the facts.

was also employed full time at another radio station, and declined LN's offer.

The testimony offered to prove that Engster, Rigell, or Patton was racially biased is not credible, for the reasons noted in the review of the evidence, Part 2b. There is no direct evidence of racial animus.

### 4. Applicable Law
### A. Equal Pay Act

■ The plaintiff first makes out a prima facie case by showing that (1) the employer is subject to the act; (2) the employee performed work in a position requiring equal skill, effort and responsibility under similar working conditions; and (3) that the employee was paid less than the employees of the opposite sex providing the basis for comparison. *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (5th Cir.1987), *cert. denied*, 485 U.S. 930, 108 S.Ct. 1101, 99 L.Ed.2d 264 (1988). A showing of equal work requires only that the plaintiff prove that the skill, effort and responsibility required in the performance of the jobs compared are substantially equal. *Id.*, citing *Jones v. Flagship International*, 793 F.2d 714, 723 (5th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). Proof of discriminatory intent is not required to establish a prima facie case under the Equal Pay Act. *Peters, supra.*

■ The burden of proof then shifts to the employer to show that the pay differential is justified under one of the Act's four exceptions. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974); *Plemer v. Parsons–Gilbane*, 713 F.2d 1127, 1236 (5th Cir. 1983). The Act provides four exceptions for disparate wage payments. These are: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality; or (4) a differential based on any other factor other than sex. 29 U.S.C. § 206(d)(1). The exceptions are affirmative defenses on which the employer has both the burden of production and persuasion. *Peters, supra*, at 1153; *Plemer, supra*, at 1136; *Corning Glass Works*, 417 U.S. at 195–196, 94 S.Ct. at 2228–2229.

The exception of a "factor other than sex" under the Equal Pay Act is met if, and only if, sex "provides no part of the basis for the wage differential." 29 C.F.R. 800.142. *Peters, supra* at 1154. Thus, a "but for" causal relationship must exist between the factor other than sex and the differential in pay before an otherwise legitimate defense under the Act's fourth exception is defeated. If the wage differential would have existed to the same extent, there is no causal connection between the impermissible factor and the differential. To allow recovery when there is no causal relationship between the impermissible factor, sex, and the complained of result would create a windfall for the plaintiff by putting the employee in a better position than she would have been in had the employee's sex not been considered. *Peters, supra* at 1160–61. A differential is "based on the factor of sex only if the factor of sex was a cause-in-fact of the pay differential." *Id.*

### B. Title VII claims

■ In a Title VII case the plaintiff must first make out a prima facie case. The prima face case creates a presumption that the employer discriminated against the employee. The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory action. *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The defendant does not, at this point, have the burden of persuasion. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. If the defendant carries this burden, the plaintiff then bears the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's explanation is unworthy of credence. *Plemer, supra*, at 1136, citing *Burdine*, 450 U.S. at 256, 101 S.Ct.

at 1095. The Title VII plaintiff always bears the burden of persuasion.

■ Title VII prohibits discrimination in compensation based on race or sex. To prove a prima facie case of racial discrimination the plaintiff must present evidence from which the trier of fact could conclude that she, a black person, was a member of a racial minority vis-a-vis the employer's overall work force, that she was qualified for the position, and was paid less than a similarly situated white employee. The burden of proving a prima facie case of racial discrimination is not onerous. *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1094; *Jett v. Dallas Ind. School District,* 798 F.2d 748, 756 (5th Cir.1986).

■ In a Title VII case alleging discrimination in compensation based on sex, the four affirmative defenses of the Equal Pay Act are incorporated in to Title VII. *Plemer, supra,* at 1136. The employer's articulation of one of these exceptions satisfies its burden of production in a Title VII case. The employer does not need to persuade the court that it was actually motivated by the articulated exception. The burden remains with the Title VII plaintiff to prove that a discriminatory reason more likely motivated the employer, or that the employee's explanation is unworthy of belief.

■ In making out the prima facie case, the employee may use statistical evidence, *Plemer,* at 1137–1138, and may compare salaries of both predecessors and successor employees. *Id*

In evaluating statistical evidence and comparing salaries, the court must keep in mind that different job levels, different skill levels, previous training and experience, all may account for unequal salaries in an environment free from discrimination. *Plemer, supra,* at 1138, citing *Pouncy v. Prudential Ins. Co.,* 668 F.2d 795, 803 (5th Cir.1982).

■ The court does not review employer decisions to determine whether they made good business sense or were otherwise fair. Nevertheless, evidence of subjective, standardless decision making by company officials, which is a convenient mechanism for discrimination, may satisfy the requirement of evidence of a discriminatory motive. *Bunch, et al. v. Bullard, et al.,* 795 F.2d 384 (5th Cir.1986); *Boykin v. Georgia–Pacific Corp.,* 706 F.2d 1384, 1390 (5th Cir.1983), cert. denied, 465 U.S. 1006, 104 S.Ct. 999, 79 L.Ed.2d 231 (1984). Only employers are subject to liability under Title VII. The definition of an employer is, however, broad and includes agents of the actual employer. 42 U.S.C. § 2000e(b). In ascertaining the scope of this agency, Title VII should be accorded a liberal interpretation in order to effectuate the purpose of Congress to eliminate the inconvenience, unfairness and humiliation of ethnic discrimination. *Hamilton v. Rodgers,* 791 F.2d 439, 442 (5th Cir.1986); citing *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971), cert. denied, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). A person is an agent under § 2000e(b) if he participated in the decision making process that formed the basis of the discrimination. *Hamilton, supra.* Otherwise, supervisory personnel may believe they can violate Title VII with impunity. *Id.*

### 5. Conclusions
#### A. No Equal Pay Act violation

■ Plaintiff established a prima facie case under the Equal Pay Act by proving that her March 1986 full-time anchor reporter starting salary of $15,000 per year was less than the December 1988 full-time starting salary of $19,000 per year paid to Hunter, and by proving that the anchor reporter positions require equal skill, effort and responsibility under similar working conditions. Defendant then overcame the prima facie case by showing that the pay differential was justified based on a factor other than sex. Simply put, Hunter was a better anchor reporter than Holden. His prior work history demonstrated a greater depth of experience than Holden had. His on-air presentation was better than Holden's, too.

Plaintiff's equal pay act claim is further undermined by the fact that LN offered the same part-time position, at the same pay, to a female, Weatherspoon, before of-

fering it to Hunter. Both Hunter and Weatherspoon were similarly situated. Both already had full-time employment at another radio station when they were approached by LN.

Nor can the plaintiff succeed in an Equal Pay Act claim based on a comparison between Holden's and Hunter's starting part-time pay. Although the level of skill, effort and responsibility required to perform the duties of an anchor reporter are substantially equal, there is no doubt that Hunter was much more experienced and polished as an anchor reporter in September 1978 than Holden was in October 1985. His resume, Plaintiff's Exhibit 7, page A00112, showed an educational background and depth of experience far superior to what Holden had when she first started at LN.

Plaintiff's prima facie case is also undercut by the fact that other part-time anchor reporters, both male and female, whose level of experience was comparable to Holden's also started at $7.00 per hour. None of them had the background and experience of Hunter.

Finally, both Hunter's part-time and full-time pay was the result of negotiation, whereas Holden's salary was not. Holden came to LN in October 1985, after being terminated from her previous job and had been unemployed for eight months. She was in no position to demand any more than what LN offered her. Her lack of any bargaining strength had nothing to do with the fact that she is a female. Likewise, Hunter's higher starting part-time pay had nothing to do with the fact that he was a male. He was better positioned in the marketplace—by virtue of his background and experience—to demand more than $7.00 per hour.

Therefore, the plaintiff has failed to prove a violation of the Equal Pay Act.

### B. No Title VII violation

■ Plaintiff also established a prima facie case under Title VII by showing that Holden is black, blacks were a minority at LN in the news room, she was qualified for the job of anchor reporter, and was paid less than other anchor reporters who were white. Specifically, plaintiff showed that Hunter, both as a full-time and part-time anchor reporter, Barker and Logue, were paid more than Holden. Although Davis and Simon had a higher starting annual salary than Holden, their salaries were based on a 45–hour work week. Holden's work week also increased to 45 hours in August 1988. Her salary was $16,000 at the time, and was increased by an additional five hours pay per week.

Defendant LN offered a legitimate, nondiscriminatory reason for the higher pay received by Barker, Logue and Hunter. They all had more experience and were better qualified than Holden. Barker had previously been employed by LN. No doubt, LN's management was certainly aware of her abilities when she was hired as a full-time anchor reporter. Hunter's education, experience and background was reviewed above in Part 4.A. and will not be repeated. Logue, already had some four years of experience working for a statewide radio network when she was hired as a full-time anchor reporter. Neither Holden nor any other black anchor reporter had similar experience. Anchor reporters with experience similar to Holden's were paid similarly.

In the face of this evidence, it was the plaintiff's burden to persuade the court that a discriminatory reason more likely motivated LN's pay determinations, or to show that LN's explanation is unworthy of credence. Plaintiff failed to do either. There was no direct evidence of discriminatory animus, either sexual or racial. Holden's disagreement with the amount of news coverage given to David Duke reflects more her own interpretation that the air time given Duke promoted what he said, and therefore indicated racist tendencies on the part of anyone who disagreed with her. The other evidence presented does not support this interpretation and Title VII liability is not predicated upon holding unpopular political views or providing media coverage to those who do. The other evidence offered to prove racial ani-

mus at LN was vague, unsubstantiated by other witnesses, or simply not credible.[18]

It is worth noting that despite the criticisms of Holden's job performance, both on the air and in the office, LN did not demote her, dock her pay, or fire her. In fact, she was promoted to assistant news director in December 1988 and her pay was increased to $19,100 per year. Her performance evaluations recognized her reporting skills. She was a valued employee. Nevertheless, she was not as experienced as those with whom she would compare herself, nor was her on-air performance as good as theirs. Courts have recognized that the appearance of a company's employees may contribute greatly to the company's image and success with the public, and thus that a reasonable dress or grooming code is a proper management prerogative. *Craft v. Metromedia, Inc.*, 766 F.2d 1205 (8th Cir. 1985). In television—a visual medium—appearance plays an important role. In radio, the sound of the broadcast plays a similar role. Engster and LN's upper management were more sensitive to this consideration than Holden. The testimony supported the legitimacy of the consideration as well.

Having failed to carry the burden of persuasion required under Title VII, the plaintiff's Title VII claim fails.

### RECOMMENDATION

It is the recommendation of the magistrate judge that judgment be rendered herein in favor of the defendant, Louisiana Network, Inc., and against the plaintiff, Equal Employment Opportunity Commission, and intervenor, Debra Holden dismissing the complaint and intervention.[19]

Baton Rouge, Louisiana, June 24, 1992.

---

**18.** This testimony was discussed in Part 2.B. above.

**19.** In its answer to the complaint LN sought to recover its attorney's fees and expenses, presumably pursuant to 42 U.S.C. § 2000e–5(k). This matter can be addressed in a motion, following entry of the court's opinion, if the parties are unable to resolve it amicably.